# In re Charles Harris, a Supposed Insane Person.

Kent, September Term, 1893.

Lunatics — jurisdiction of Chancery over; Restraining order — over property and person of alleged lunatic during interval between issuance and execution of lunacy proceedings; Petition for restraining order over alleged lunatic's property — practice in.

1. The Court of Chancery in this State, by special legislative grant, has jurisdiction of alleged lunatics from the very inception of the process by which their sanity or insanity is finally and definitively ascertained; and has the power to suspend or supersede the control of the supposed insane person over his property during the interim between the granting and the execution of the writ of insanity.

2. During lunacy proceedings, the presumption of sanity must remain in abeyance so far as it relates to the temporary restraint of the personal liberty and property of the supposed insane person.

3. When petitioned to restrain a supposed insane person from control over his property during pendency of lunacy proceedings, the Court of Chancery should not examine into the case more than is necessary to move 'it to grant the order for the protection of the alleged lunatic's person and estate; and, therefore, counter affidavits, negativing the allegations contained in the sworn statements of the petitioner, will not be heard.

4. The petition for a restraining order is but collateral to the proceedings in lunacy, and dependent upon, it for its foundation, and the affidavits upon which the lunacy proceedings are founded may ·be used in aid of this application.

5. The statement in the petition for a restraining order during the pendency of lunacy proceedings, supported by affidavit, that respondent has parted with large sums of money without receiving a visible equivalent therefor, will prevail against an answer which denies the respondent's mental incapacity, and his being under the influence of any persons for any purpose whatever, but does not specifically deny that statement in the petition; and is *prima facie* evidence of the incompetency of the respondent to govern himself and manage his estate, and justifies the Court of Chancery in granting such order.

PETITION for provisional order pending proceedings in lunacy.

The facts are fully stated in the first portion of the opinion of the Chancellor.

Nathaniel B. Smithers, Edward Ridgely, James Pennewill and James H. Hughes, for petitioner.

John B. Penington, W. C. Spruance, E. G. Bradford, L. C. Bird, for Charles Harris.

WOLCOTT, CHANCELLOR.— Sarah D. McPhail on the 2d day of October, A. D. 1893, presented a petition as the niece of Charles Harris of the Town of Dover in Kent County, and the State of Delaware representing that he was insane, and by reason thereof wholly unfit to govern himself or manage his estate, and praying that a writ may be issued to inquire into the same by a jury. To this was annexed her affidavit as to the truthfulness and correctness of the allegations therein set forth as were also the affidavits of Doctors Wilson and Downs in

which they declared that they were both acquainted with the said Harris, and to the best of their judgment and belief he was insane and narrated the facts and circumstances by which such unsound state of mind was rendered manifest. On the same day the Chancellor ordered a writ *de lunatico inquirendo* to be issued in accordance with the prayer of the petitioner directed to the sheriff of Kent County returnable at chambers, December 7, 1893.

On the 20th day of October, A. D. 1893, the said Sarah D. McPhail as the niece and one of the nearest blood relations of the said Charles Harris presented another petition, reciting therein the said proceedings in lunacy and alleging: First, That he is the owner of a large personal property, consisting of bonds, stocks and other securities, which he has for more than twenty years kept in the custody of The Fidelity Insurance, Trust and Safe Deposit Company of the City of Philadelphia, in whose management he has had the most implicit confidence. Second, That notwithstanding such confidence the said Harris was recently induced by those with whom he is exclusively surrounded to take means to withdraw his effects and papers from the said company and to that end had executed one or more letters of attorney. Third, That he is in the exclusive control and keeping of persons who have by reason of his mental and physical incompetence acquired absolute dominion over him and who are seeking through the influence thus acquired to obtain possession of his estate and effects for their own private purposes, and who have already by the

same means succeeded in obtaining from him large sums of money to the extent of several thousand dollars for their own private uses and who will continue to do so to the waste and destruction of his estate unless a provisional order should be made restraining the control of the said Harris over his property pending the said insanity proceedings.

The respondent, by his solicitors, on the 25th day of October, A. D. 1893, on the day set for the hearing, filed an answer under oath to the last-named petition, in which he admitted all the facts set forth therein in relation to the stocks, securities, etc., owned by him and then being kept by him in the Fidelity Insurance, Trust and Safe Deposit Company of the City of Philadelphia, but denies that it ever had the management thereof. He also admits or avers that after full consultation with his counsel alone, on the 2d day of October, A. D. 1893, he instructed them to prepare a letter of attorney authorizing and empowering the Equitable Guarantee and Trust Company, a corporation of the State of Delaware, to receive from the Philadelphia Company all his personal effects in its control and to invest in such good and safe securities as said attorney should deem proper, all moneys belonging to the principal of his estate, which it might receive. He further says that the instructions thus received were embodied in a letter of attorney and by him executed the following day, which with the key to the deposit box was delivered to the said Delaware Company. He alleges as a reason for this action his advanced age and physical infirmities

and the annoyance to which he had been recently sub-
jected by reason of certain litigation in the State of
Pennsylvania respecting his said property, deposited as
aforesaid with said Philadelphia Company, and also his
desire of having his property brought into Delaware
where he resides and expects to reside during the resi-
due of his lifetime, so as to avoid the expense, delay
and complication in the settlement of his estate in Penn-
sylvania in case he should die leaving said property in
the custody of said company.   He denies that he has
since the commencement of the said proceedings in in-
sanity executed any letter of attorney other than the
one before mentioned, or that any other letter of attor-
ney whatsoever executed by him is now held by any
person or corporation.   He also denies that he was ever
induced under the influence of any person or persons to
withdraw all his effects from the said Philadelphia Com-
pany, and avers that said letter of attorney was his
voluntary act and was made by him with the approval
and under the advice of his counsel.   He also disclaims
any desire or intention to revoke said letter of attorney
or to make any other except so far as may be necessary
to execute the powers intended to be conferred upon the
said Delaware Company.   The respondent also avers
that there is no reasonable ground to apprehend that
any loss, waste or injury to his estate will occur during
the pendency of the said proceedings in insanity or at
any other time by reason of the said letter of attorney.
He denies that he is mentally incapable of governing
himself or managing his estate or that he is or has been
in the custody, control or keeping of any person or

persons whatsoever, or that any person or persons has or have acquired dominion or undue influence over him for any purpose whatever.

I have stated the facts quite fully as shown by the petition and answer in order that the points of agreement and disagreement between the two may the more clearly appear and the weight of the facts be more correctly estimated.

The question to be determined is whether the relief prayed for should be granted in the light of the foregoing statement of facts. The object sought to be attained by the petitioner is to hold the property of the alleged lunatic *in statu quo* until the termination of the proceedings in lunacy previously instituted. That the power to do this, or something which would be substantially the same, resides in this court when a proper case is presented has ceased to be a subject about which there can be any serious controversy. Chancellor Kent, In re Wendell, 1 Johns. Ch. 600, and Chancellor Williamson, In re Dey, 1 Stockt. 181, of this country; and Lord Eldon, in the case of Ridgeway v. Darwin, 8 Ves. 66, and Hargrave, In re Heli, a lunatic, 3 Adk. 634, in England, unequivocally recognized this doctrine to the extent in which it is claimed in this case. But it does not depend upon the authority of adjudged cases, for it is founded on the authority of reason as well as precedent.

If there were no power to suspend or supersede the right of a person, supposed to be of unsound mind, to manage and control his property during the interval between the issuance and execution of a writ of in-

sanity, it would many times partially, if not wholly, fail of its purpose, for during that time he might waste, squander, destroy, or otherwise dispose of it, especially if it consisted of bonds, stocks, securities and certificates of indebtedness which pass by delivery or assignment. After the waste or destruction of his property, of what use would it be to prosecute the writ to a finality and obtain the appointment of a trustee, the medium through which the court exercises a permanent control over the person and property of those who have been adjudged to be *non compos mentis* by due course of law.   Clearly none, so far as the preservation of his estate is concerned, if it consisted of personal property, for it would be out of reach of the trustee or placed in a situation that would make restitution impossible without protracted and expensive litigation.

While it is true that this court, by virtue of its inherent and general powers, can take cognizance of the acts and persons by which the alleged lunatic may be fraudulently and unfairly deprived of the possession of his property, it goes without saying that such a remedy is manifestly inadequate, not to say in many cases absolutely fruitless.

A preventive remedy, when it can be employed, is more effectual for the protection of human rights than one which is merely corrective in its operation and effect.   The former stands between the wrongdoer and those who are liable to become his victims, the latter simply proposes to restore that which has been taken or to imperfectly compensate in damages for the loss or injury sustained.   The old adage, " an ounce of pre-

vention is worth a pound of cure," illustrates with pecu-
liar force the relative or comparative efficiency of these
remedies as applied to persons whose mental condition
is in progress of judicial inquiry.   It was urged by one
of the solicitors for the respondent that as the English
Court of Chancery had no jurisdiction over the persons
and property of nonadjudged lunatics, as such, and as
the Chancellor of England had jurisdiction only of that
class of persons as the representative of the King, as
*parens patriae*, by means of his sign-manual, the Chan-
cellor of this State, whose general powers are inherited
from the English Court of Chancery, cannot, by virtue
thereof, assume the care and supervision of such per-
sons unless brought within one or more of the well-
recognized heads of equity jurisdiction.   This is true.
Neither does the Court of Chancery in this State possess
this special authority as a part of its original, inherent,
equitable jurisdiction.   It is derived from the legisla-
ture just as the Chancellor of England derived it from
the King by virtue of his sign-manual.   This court
occupies the same relation, under chapter 49 of the
Revised Code, to those persons who are *non compos
mentis*, as the representative of the people, as the Chan-
cellor of England does to the same class of persons
within his jurisdiction, as the delegate of the Crown,
so that the proceedings to inquire into the alleged in-
sanity of any person are not instituted in this State by
the Chancellor, by means of a special power not in-
cluded in the general powers of his office, as it is in
England, but by the Court of Chancery itself by a direct
legislative grant.   Therefore, the Court of Chancery

4

Opinion.

assumes jurisdiction of alleged lunatics who have not been so adjudged from the very inception of the process by which their sanity or insanity is finally and definitely ascertained. This view of the matter strengthens rather than weakens the position already taken, for, as just observed, this power is conferred upon the court and not devolved upon the Chancellor in the nature of an *ex-officio* duty. While this court, under the provisions of the statute just referred to, cannot assume the permanent and exclusive custody of a supposed insane person until he is so found by a jury, yet he is in a limited sense during the pendency of lunacy proceedings, its ward, around whom it is bound to throw the arm of protection. For persons, thus situated, if insane, that is not unfrequently one of the most critical periods during the continuance of their mental disorder in which the most unremitting vigilance is necessary for the protection especially of their estates. And if the court is powerless to act, however apparent and imperative the necessity, the legislature would stand convicted of the folly of conferring jurisdiction over a matter, and at the same time withholding the means of executing the beneficent purpose for which it was given.

It will not do to say that the presumption of sanity stands in the way of the exercise of this humane power, for it, like the presumption of innocence, must sometimes remain in abeyance so far as it relates to the temporary restraint of personal liberty, the one for the good of the person, the other for the good of the people, before either shall have been rebutted by the production of satisfactory and competent evidence.

But two of the solicitors for the respondent admit the existence of such a wise, conservative power, but they strenuously deny that such a case has been presented as to provoke or call it into activity. They insist that something more than the bare allegations of the petitioner, supported by her affidavit, is necessary to justify the affirmative action of the court in respect to her prayers and requests, namely, the production of additional and corroborative affidavits. They further intimate that the respondent should have the privilege of submitting counter affidavits negativing the allegations contained in the same sworn statements of the petitioner.

Such a course would necessarily raise an issue of fact involving the mental capacity of the alleged lunatic and necessitate the decision of the very matter which the sheriff is commanded to inquire into by the oaths of twelve good and lawful men. To weigh testimony submitted on both sides, whether it be much or little, and then decide according to the preponderance thereof, would be assuming the functions of the jury and determining in advance the issue of fact which the law has wisely confided to their judgments.

The controversy out of which this application grows should not be subjected to examination any more than is necessary to move the court to grant an order for a writ of insanity and such other orders that look to the protection of the alleged lunatic's person and estate. Each party has a right to insist that his or her status before the jury shall not in anywise be affected by any

decision that may be made by this court in any intermediate or preliminary proceeding. A cautionary step like this, intended only for the preservation of the alleged lunatic's property, should not, in my opinion, be allowed to take on the character of an adverse proceeding, for if it were it would inevitably end in the decision of a question forbidden by both the letter and spirit of the law.

Since, then, the power to suspend or supersede the control of a supposed insane person over his property *ad interim* is lodged in this court, the next inquiry that naturally arises is, what amount of *ex parte* proof or authenticated facts is necessary to call it into exercise?

The solicitors for the respondents contended that the petition and affidavits upon which the proceedings in lunacy were grounded are no part of this proceeding and though matters of record in this court they could not be used in support thereof. The latter is but an incident or outgrowth of the former, and, therefore, has no independent origin or existence. It has all the characteristics of a dependent or secondary life. If there had been no writ of insanity this application would have no foundation and the petitioner would have no standing in this court. And any order that may be made now will *ipso facto* determine with the return and confirmation of the inquisition. The same result would follow in case the writ at any intermediate stage should be quashed or otherwise suppressed. If this proceeding is only subservient to and dependent upon the other proceeding and through it derives its vitality from the same conditions I can see no reason why the affi-

davits upon which it is founded cannot be used in aid of this application.

While the allegations contained in those affidavits, assuming them to be true, only prove the incapacity of Mr. Harris to govern himself or manage his estate or a condition of mind that renders him susceptible to the alleged overmastering influences which constitute the ground of the petitioner's fear and· complaint, yet it is a fundamental fact that must appear by *ex parte* proof as *prima facie* true before the petitioner could be heard at all upon this or a similar application. Whether or not some proof outside of the petitioner's affidavit should have been made as to the extent of such influence and the exercise or attempted exercise thereof for a dishonest and fraudulent purpose in order to obtain the desired relief, it is not necessary for me now to decide. " Sufficient unto the day is the evil thereof." The allegation of the petitioner in regard to the wrongful getting of a part of the respondent's money is for the purposes of this case practically admitted to be true by his irresponsive ·and evasive answer in respect thereto. It is alleged in the petition " that the mental and physical condition of the said Charles Harris is such as that he is wholly incapable of governing himself or managing his estate; that he is in the exclusive control and keeping of persons who have acquired absolute dominion over him and who are seeking, through the influence they have acquired over him, to obtain possession of his estates and effects for their own private purposes and who have already succeeded in obtaining from him large sums of money to the extent of several thousand dollars."

This is a very material allegation which could not have failed to challenge the attention of respondent's solicitors, and to avoid the effect of admitting the truth of any part thereof it should have been explicitly answered by an express denial in every particular or by way of confession and avoidance. The answer fully denies every essential part of the allegation except that which relates to the obtaining from the respondent large sums of money by the persons with whom he is surrounded. To this the answer is wholly silent or irresponsive. Silence or evasion as to a material allegation in a bill or a petition of this kind is always construed into an admission of its truth. It may be urged that the denial of the respondent's mental incapacity to govern himself or manage his estate, and of his being under the control, influence or dominion of any person or persons for any purpose whatever, deprives the act of obtaining money from him of any wrongful or immoral significance. This would be true if his mental faculties possessed their usual vigor. He would then have a right to do as he pleased with his money without interference from any quarter whatever. But the affidavits, which are a part of this case, allege an entirely different state of facts which must prevail against the allegations in the respondent's answer, where there is a material conflict. Now, the *prima facie* incompetence of the respondent to govern himself and manage his estate in connection with the fact that he has parted with several thousand dollars without receiving a visible equivalent therefor, justifies this court in granting an order suspending his control over his property until the return and confirmation of the inquisition in lunacy.

Before closing, however, I desire to say that the conclusion at which I have arrived cannot in any way be construed as an expression of a lack of confidence in the integrity or prudence of the counsel for Mr. Harris in advising the execution of the letter of attorney constituting the Equitable Guarantee and Trust Company his attorney in fact or in any other respect. I have no doubt that they have been sincere in all that they have done, and if the letter of attorney were irrevocable the securities would be perfectly safe in the hands of said company, but the recognition of the power to make such an instrument would be a recognition of the power to take it at any time and to execute to another, thus having the funds or securities of the respondent exposed to the danger of loss or destruction apprehended by the petitioner.