## CHASE *v.* CHASE.

[No. 20,205.    Filed June 24, 1904.]

ATTORNEY AND CLIENT.—*Authority to Appeal for Insane Person.*—Where attorneys on behalf of their client file an original action in the Supreme Court for a writ of mandate against the trial judge to compel him to settle and sign a bill of exceptions, and a rule is entered on behalf of the defendant for such attorneys to show authority to appear for such plaintiff, and the return of such attorneys shows that they had been employed in 1899 to look after and attend to any and all business for said plaintiff and employ other attorneys if necessary; that also in 1900 the same contract and agreement had been entered into and that said employment has not been revoked; that said attorneys believe that said plaintiff in March, 1903, was still in full possession of his mental faculties, and it is shown by the defendant that on April 27, 1903, said plaintiff was tried on a charge of lunacy and was adjudged of unsound mind; that said attorneys were present at said trial and offered no evidence in said cause; that a guardian was appointed; that said plaintiff is hopelessly insane and does not know of any appeal, being oblivious to everything, and that such guardian is not seeking any appeal, such original action will be dismissed as unauthorized. *pp. 179–186.*

INSANE PERSONS.—*Agency.*—Where a person employs attorneys to attend to any and all legal business which such person may have, and after such employment becomes insane, such employment or agency ceases and if the agreement were made to cover an expected period of such person's insanity, such contract would be void as against public policy, since the law takes charge of insane persons. *pp. 186–188.*

SAME.—*Inquisition.—Right to Contest by Attorney.*—Where the defendant in an inquisition proceeding for lunacy is too imbecile to know anything of the nature of what is being done, it is proper for the court to entrust his interests to the prosecuting attorney as provided by §2715 Burns 1901, and the court after satisfying himself of such defendant's condition may refuse any third persons, such as attorneys would be under the circumstances, to interfere with the course of the proceedings. *p. 189.*

PLEADING.— *Unauthorized.—Motion to Strike Out.*—Where proceedings are instituted or an appeal taken on behalf of a person under the disability of insanity, without any authority from the legal guardian, and where such insane person is so imbecile as not to know anything that is being done, such pleadings will be stricken from the files. *p. 190.*

Original action by Moses Fowler Chase against Joseph M. Rabb, as judge of the Benton Circuit Court, for a writ of mandate to compel him to settle and sign a bill of ex-

ceptions in the case of Frederick S. Chase against Moses Fowler Chase. Afterward the transcript and an assignment of errors were filed on appeal in said case, and on motion the two cases were consolidated. Motion to dismiss both the original action and the transcript and assignment of errors. *Sustained, and consolidated cause dismissed.*

*W. A. Ketcham, A. L. Kumler, T. F. Gaylord, G. P. Haywood, C. A. Burnett* and *Kittredge & Wilby,* for appellant.

*A. C. Harris, F. C. Cutter, W. V. Stuart, E. P. Hammond, D. W. Simms, J. Frank Hanly, W. R. Wood, Daniel Fraser, W. H. Isham, S. P. Baird* and *H. R. Probasco,* for appellee.

GILLETT, J.—On the 6th day of October, 1903, there was filed in this court what purported to be the application of Moses Fowler Chase for an alternative writ of mandate against Hon. Joseph M. Rabb, as judge of the Benton Circuit Court, to compel him to settle, approve, and sign certain bills of exceptions in a proceeding commenced by Frederick S. Chase against Moses Fowler Chase to have the latter adjudged a person of unsound mind and incapable of managing his own estate. Transcripts of such parts of the proceeding as were sought to be incorporated into bills of exceptions were filed as a part of said application. On the 13th day of October, 1903, there was filed in this court the record proper in said proceeding, together with what purported to be the assignment of errors of Moses Fowler Chase. On motion subsequently made, the two causes were ordered consolidated. Upon the appearance of Frederick S. Chase and respondent Rabb, motions were made to dismiss said proceedings in this court, on the ground that the attorneys who had instituted the same had done so without authority. Affidavits were filed in that behalf to the effect that Moses Fowler Chase was at the times mentioned, and for more than three years then last past had been, wholly

demented and incapable of transacting any business whatever. There was also filed in that connection the affidavit of the prosecuting attorney of the Benton Circuit Court, to the effect that he had appeared on behalf of Moses Fowler Chase in said court, and that the steps which had been taken subsequently in that behalf were taken without his authority or consent. On the 16th day of March, 1904, a motion was filed on behalf of Frederick S. Chase that, on the records and affidavits on file in said consolidated cause, a rule issue requiring the attorneys whose names were attached to the petition for a writ of mandate and to said assignment of errors to appear and produce and show the authority by which they appeared for Moses Fowler Chase in said cause, and also to produce and prove the authority by which they filed said records in this court. This rule was entered, and on the day that it was made returnable said attorneys appeared and, respectively, filed affidavits for the purpose of obtaining a discharge of said rule.

The return of Mr. Kumler, representing the law firm of Kumler & Gaylord, is the only one which it is necessary to state the substance of, as it appears from his return that said firm employed all of the other attorneys, and as they claim no other employment in the matter of the proceedings had in this court. The return mentioned, after showing Mr. Kumler's means of judging the mental condition of Moses Fowler Chase from the month of October, 1899, to the month of March, 1900, and expressing the opinion of the affiant that said Chase was of sound mind during that period, states that immediately following an adjudication had by the Tippecanoe Circuit Court on the 21st day of November, 1899, that said Chase was of sound mind, his personal property was turned over to him by the receiver who had had it in charge. It is then alleged "that on or about the 1st day of December, 1899, the appellant, at the law offices of said Kumler & Gaylord, in speaking about said trial and judgment, and the conduct of appellee in aid-

Chase *v.* Chase.

ing, assisting, and procuring said proceedings, and endeavoring to have appellant adjudged to be a person of unsound mind, stated to the respondent, in the presence of Thomas F. Gaylord, that he was fearful and apprehensive that said appellee would not be satisfied with said judgment of said court adjudging him to be of 'sound mind, and would thereafter endeavor by like or other means and proceedings to trouble and bother him, and that he believed said appellee was desirous of having him adjudged of unsound mind for the purpose of acquiring possession and control of his property, and that he (the said appellant) had been greatly annoyed, vexed, and harassed by said proceedings and the consequent notoriety, and was desirous of protecting himself and his property from similar efforts that might thereafter be made by said appellee or others at his expense or procurement, and in his interest, and he thereupon appealed to the respondent, who was then and there the partner of Thomas F. Gaylord, as aforesaid, in the presence of said Gaylord, to protect him and his estate in the event that he should be further troubled by said appellee by any like or similar proceedings, and appellant then and there employed said respondent and Thomas F. Gaylord, as such firm, as his attorneys at law, to protect him and his said estate, and to resist to the utmost, in any and all courts, any proceedings that might thereafter be brought by said appellee, or anyone at his instance or on his procurement, for such purpose, and said appellant then and there spoke of the fact that four law firms had been employed by his father, the appellee, in said proceedings, and then and there requested and authorized said firm, if, in their judgment they should need any legal assistance or help to resist any action or proceedings that might be brought by said appellee, or others in his interest, for the purposes aforesaid, to employ such assistance.

"Respondent further shows that on one or two occasions during the months of January and February, 1900, and

particularly in the last interview that this respondent had with appellant shortly prior to his leaving the city of La-Fayette with the ultimate purpose of going to and sojourning in Europe for several years, he again called the attention of respondent and Thomas F. Gaylord to the fact that he was apprehensive and troubled about the conduct of said appellee in the future, in reference to his pursuing him further, and attempting to get control of his person and property by the means aforesaid, and again, then and there, requested said respondent and Thomas F. Gaylord to protect his interests in that respect, and to appear for him and defend and protect him in all courts in any action that might be brought by appellee, or anyone in his interest, having that end in view, and then and there also gave the said Kumler & Gaylord full authority to appear for him generally in all of his matters. And respondent says that since said time, and up to the time of the beginning of the proceedings in this cause, he and the said Thomas F. Gaylord, have acted as counsel for appellant in different matters in the courts of Tippecanoe county, and other matters in said county, and have had in their office business matters of said appellant, as counsel for him, continuously from said employment to the present time, other than the case at bar. Respondent shows that at the periods aforesaid, when appellant sought the employment of respondent and the said Thomas F. Gaylord, as his counsel, they, as such firm, accepted said employment, and then and there agreed with and promised said appellant that they would, in the event any of the contingencies should arise, appear for him and defend him against such proceedings, and would, if necessary, employ counsel to assist them in such matters." It is also alleged in said return that said contract of employment has not been recalled or revoked in any way, but is still subsisting; and it is alleged, on information and belief, that prior to and during the month of March, 1903, said Moses Fowler Chase had full possession of his mental faculties,

Other matters are alleged in said return, but it is unnecessary to exhibit them in this opinion.

The question now before us is whether said records should be stricken from our files, and this consolidated cause be dismissed, on the theory that the attorneys against whom said rule issued were not authorized to take the steps. by virtue of which said cause appears upon our docket. In passing upon the matter we have regarded ourselves at liberty to examine the records which have been filed, for the purpose of ascertaining such additional facts as are pertinent to our inquiry.

The petition upon which the trial in the Benton Circuit Court was had was filed by Frederick S. Chase, the father of Moses Fowler Chase, in the Tippecanoe Circuit Court, on the 16th day of April, 1903. On the same day the latter was served with summons to appear on the 27th day of April, 1903. On the date last mentioned, the clerk of said court filed an answer to the petition, as required by statute, and the prosecuting attorney of the Tippecanoe Circuit Court also filed answer, by way of general denial, to said petition. It appears that this same controversy, relative to the right of attorneys to appear for Moses Fowler Chase under the agreement made with Kumler & Gaylord, was raised in the Tippecanoe Circuit Court, and that said court, after considering affidavits and counter-affidavits upon the subject, placed the defense in the hands of the prosecuting attorney, but that the court did accord to seven attorneys, including all of those seeking to appear under said agreement, the opportunity to appear with and assist the prosecuting attorney—a permission of which they availed themselves, although with the reservation that their action was to be without prejudice to their claim of a right to appear. A special order was made by the court, authorizing counsel to visit said defendant and have consultation with him at all proper times. A change of the venue of said cause was afterward taken on his behalf to the Benton

Circuit Court, where the cause was tried. Said defendant was produced in court, and he was represented during the trial by the prosecuting attorney of Benton county, and also by the special counsel appointed as before stated. There was a verdict in favor of the petitioner, and upon its return the court entered an order discharging said special counsel from their employment, and it afterwards refused to recognize them as attorneys in the cause. The prosecuting attorney declined to file a motion for a new trial, and a decretal order was entered in accordance with the finding of the jury.

We have read the voluminous transcript of the evidence which is exhibited with the petition for an alternative writ of mandate, so we are fully cognizant of the state of the evidence. As to the issue whether the defendant below was of unsound mind at the time of the filing of the petition, it may be said that the evidence was overwhelming not only that he was then insane, but that he had long been in that condition. Moreover, there was abundant evidence that from a time before the filing of the petition down to and including the time of the trial he exhibited not a gleam of intelligence further than a disposition passively to perform some simple acts upon the commands of others. There was absolutely no evidence contradicting the showing made as to his utter helpless insanity during the period referred to. It appears from the record that during the introduction of evidence the court asked counsel for the defense the following question: "And now I want to know whether or not you gentlemen who represent this defendant are going to introduce any evidence that will tend to controvert any of the evidence that the petitioner has introduced relative to the mental condition—to the sanity—of this boy?" To this question one of the attorneys now claiming the right to represent said defendant answered: "No, your honor, we are not intending to controvert one word of it." But we need not dilate upon the insane condition of the defendant

below during the time we have referred to, nor need we speculate upon his condition at the time the steps now in question were taken. Counsel must be presumed to know the extent of their authority, and, in filing returns, their omission to refer to the mental condition of said defendant at and after the filing of the petition compels us to presume most strongly against his capacity.

It is contended in support of the right of counsel to take the steps referred to that a proceeding to have a person adjudged of unsound mind is an adversary proceeding, in which the respondent is entitled at all stages, including appeal, to be heard by counsel of his own selection. This may be conceded as an academic proposition, at least for present purposes; but we are here confronted by the fact that the unfortunate man in whose behalf the steps in question have been taken was, and continued to be, wholly oblivious to the fact, and incapable of knowing, that his mental status was involved in the proceeding sought to be here drawn in question, and further that since the judgment was rendered he has been without a mind to realize that there is a judgment concerning him to appeal from, or that others have taken steps to procure a reversal of that adjudication. If the case before us were one where the defendant below, insane though he clearly is, had sufficient mental capacity to desire and request counsel to aid him in contesting the proceeding, then the abstract proposition urged by counsel might be presented for our consideration; but here, where all of the evidence shows that the man is devoid of understanding, and incapable of reasoning to any extent whatever, it is evident that the acts done on his behalf subsequent to the adjudication complained of are to be treated as done without authority, unless the agreement between him and Kumler & Gaylord authorized the proceedings which have been taken in his behalf in this court.

In considering the latter question, we appreciate that the decree of the Benton Circuit Court must not be treated as

an adjudication, since that would be to assume the whole case against said defendant. We shall therefore treat the question as to whether counsel are authorized to appear by reason of the agreement mentioned as if there had been no intervening adjudication that said defendant was of unsound mind.

"The law of principal and agent is generally applicable to the relation of attorney and client. The client is bound, according to the ordinary rules of agency, by the acts of his attorney, within the scope of the latter's authority." Weeks, Attorneys, §216. Although it appears to be a controverted question whether the intervening insanity of a principal operates *per se* as a revocation of the agency, as against third persons who have, without knowledge of such insanity, and before an inquest, dealt with the agent on the assumption that the prior authority still existed, yet we apprehend that no authority can be found which sanctions, as between the principal and the agent, the right of the latter to act where he has full knowledge of the principal's insanity. Indeed, the doctrine that the insanity of the principal *per se* terminates the agency is stated in unrestricted terms by most of the text-writers. Story, Agency (9th ed.), §481; Mechem, Agency, §254; Huffcut, Agency (2d ed.), §71; Reinhard, Agency, §173; 1 Am. and Eng. Ency. Law, 1226. This is generally put upon the ground, where a reason is assigned, that the derivative authority can not continue beyond the time when the principal might himself lawfully act in the premises. This reason is scarcely applicable here, but it has also been laid down that, in the case of an agency that is not coupled with an interest, the authority of the agent does not exist during the insanity of his principal, for the reason that an agent's acts derive their validity from the presumed continued assent of the principal—a hypothesis that can not be indulged while he is insane. *Davis* v. *Lane* (1839), 10 N. H. 156.

When once the character of the engagement is classified

as involving the doing of a series of acts by one person on behalf of another, where the latter is alone concerned in the result attained, it would seem to follow, as a clear implication of law, that the authority to represent can not survive the mental competency of the latter to direct, or at least yield assent to what is being done. This reason seems particularly cogent in a case like this, where the powers granted are very extensive in their character. Relative to the effect of the principal becoming of unsound mind, where the particular relation is that of attorney and client, it is stated in 3 Am. and Eng. Ency. Law, 329: "The insanity of the client will operate as a termination of the relation." Mr. Mechem lays down the same doctrine in his work on agency, at §888.

We need not deal with the question as to the validity of the agreement set out in Mr. Kumler's return upon the assumption that it was the contemplation of the parties that the client was to continue sane, so that as principal he might control his attorneys in their resistance of the apprehended proceeding. Such an assumption would destroy the agreement, because performance on the client's part has become impossible. *Krause* v. *Board, etc.* (1904), 162 Ind. 278. Besides, by the force of his subsequent condition, the attorneys now seeking to appear for the defendant below are compelled to assume the position that the agreement was made in contemplation that it should be operative in the present circumstances. A fundamental objection to the agreement, when so construed, is that it sought to provide in advance for an extrajudicial guardianship, whereas the law has made its own provision for the care and custody of insane persons and their estates, even pending a hearing.

It is said in the brief filed in support of the sufficiency of the returns: "An attorney is in a sense an agent, but he is more than a mere agent. He represents his client in court or out of court, and in a restricted sense is thus an agent, but in a larger and truer sense is more than a mere

agent. He is an officer of the courts, and is authorized to do those things which in the nature of things the client can not do." It is the very fact that the attorney is an officer of the court which furnishes an especial reason why it should not be competent for him to bargain for a diminishing of the powers of such tribunal. It is unnecessary to consider to what extent the English court of chancery protected lunatics by virtue of a power delegated from the king as *parens patriae.* The state has an interest in the protection of its insane subjects, and we are far within our authorities when we assert that the circuit and superior courts of this State have full power, in the course of a proceeding to declare a person of unsound mind, to do any and all things which in the exercise of a reasonable discretion may be necessary to protect such person and his estate pending the disposition of the proceeding. *M'Cord* v. *Ochiltree* (1846), 8 Blackf. 15; *Ruhlman* v. *Ruhlman* (1886), 110 Ind. 314; *Van Walters* v. *Board, etc.* (1894), 132 Ind. 567, 18 L. R. A. 431; *Board, etc.,* v. *Shutter* (1894), 139 Ind. 268, 31 L. R. A. 740; *Leibold* v. *Leibold* (1901), 158 Ind. 60; *Bullock* v. *Robertson* (1903), 160 Ind. 521. And see *Erskine* v. *Whitehead* (1882), 84 Ind. 357; *In re Misselwitz* (1896), 177 Pa. St. 359, 35 Atl. 722; *In re Harris* (1893), 7 Del. Ch. 42, 28 Atl. 329.

We must assume to give the agreement operation, that it was intended to provide for circumstances which afterward existed, wherein the client was too insane to request counsel to defend him, or to exercise any act of authority over the litigation. Indulging the assumption indicated, the agreement was contrary to public policy, as it is incompetent for an attorney to bargain for an authority which enables him, at his own discretion, and without let or hindrance from anyone, to carry a defense to the limits of the law. *Davis* v. *Chase* (1902), 159 Ind. 242, 95 Am. St. 294.

We are clear that the agreement in question conferred no authority upon said attorneys to appear for said defendant

either in this court or in the court below, and it is enough to dispose of the particular claim of a right to represent him now that counsel have no subsisting employment. But apart from this, we are of opinion, at least as applied to a case like the one before us, where the defendant is too imbecile to entertain a desire that a defense should be made for him, that it is at least proper to entrust the protection of the defendant's interests to the prosecuting attorney, as provided by statute. §2715 Burns 1901. After such a defense has been made, we deem it clear that third persons (for so we must treat said attorneys) ought not, in the name merely of the defendant, to prosecute an appeal from an adverse judgment. In England the right to traverse the inquisition was granted by statute, but it was the practice not to permit a traverse until the chancellor had ascertained, upon a private examination of the alleged lunatic, that it was his desire to traverse. *In re Cumming* (1852), 1 De G., M. & G. 537. And see, also, *In the Matter of Christie* (1835), 5 Paige 241. In the case of *In re Lindsley* (1890), 46 N. J. Eq. 358, 19 Atl. 726, the master had reported that Mrs. Lindsley was not competent to exercise any act of volition, and the chancellor, in refusing permission to traverse, said: "It would be a work of supererogation to allow one to traverse who is incapable of understanding or desiring the privilege accorded him. The traverse, if allowed, would not be his act, but would be the act of those by whom he is surrounded and against whom he may need protection." It was stated in *Ex parte Roberts* (1743), 3 Atk. 5, that there was an examination of the precedents in Smithie's case, and it was found that "there was no case where an idiot had traversed by attorney, though many where a lunatic had." While there must be a trial in this State, yet the above authorities afford clear warrant in principle for refusing to third persons in such a case as this, where the defendant was totally without mind, the opportunity to interfere with the course of the proceeding, and this propo-

sition is especially applicable where their effort is to take an appeal on his behalf.

It being the opinion of the court that the agreement in question did not authorize the proceedings which have been taken on behalf of Moses Fowler Chase in this court, and as the taking of such steps has not been otherwise justified, it is ordered that the petition for an alternative writ of mandate and the transcript and assignment of errors be stricken from the files, and that the proceedings in this court in said consolidated cause be dismissed.