WILLIAM POOLE, Trustee for Howard Malcolm Armstrong, sometimes known as Howard M. Armstrong, an insane person, *v.* NEWARK TRUST COMPANY, formerly known as Newark Trust and Safe Deposit Company, a corporation of the State of Delaware.

*(July* 28, 1939.)

RODNEY and SPEAKMAN, J. J.. sitting.

*Thomas Herlihy, Jr.,* for plaintiff.

*Alexander Jamison* for defendant.

Superior Court for New Castle County, Assumpsit, No. 216, September Term, 1938.

RODNEY, J., delivering the opinion of the Court:

In the determination of the present matter three major questions arise:

(1)  Was there such a legal adjudication of the insanity of Howard Malcolm Armstrong by the appointment of a Trustee by the Chancellor that notice will be imputed therefrom and vitiate any transaction of Armstrong's after said appointment?

(2)   Was there actual notice to the bank of said appointment?

(3)   The effect of the payment of the check by the bank in the absence of either imputed or actual notice of the appointment of the Trustee.

The plaintiff strongly relies upon the proposition that Howard Malcolm Armstrong was duly and legally adjudicated an insane person by the action of the Chancellor in appointing a Trustee on April 2, 1937. Using this adjudication as a basis the plaintiff draws certain legal conclusions:

(a)   That adjudication of insanity in a Court of competent jurisdiction is notice to the whole world, and he who subsequently deals with such person does so at his peril;

(b)   That a contract of an insane person made or negotiable instrument negotiated after adjudication of insanity is void and not voidable;

(c)   That a bank which pays a check of an insane person after adjudication of insanity must refund the money paid.

The validity of these legal conclusions is dependent upon the basic fact of the legality of the alleged adjudication, and to this we must first direct our attention.

■   Legal historians agree that jurisdiction over insane persons at common law was in the *King* as *"parens patriae";* that jurisdiction of the Chancellor did not exist as an original or inherent power of the Court of Chancery, but was a personal authority directly given by the King to the Chancellor by virtue of a sign-manual. The decisions as to jurisdiction in the various States of the American Union have not been so harmonious, but with these we are

not concerned as we have the direct authority of the Chancellor, himself, that in Delaware the jurisdiction is purely statutory. *In re Charles Harris*, 7 *Del. Ch.* 42, at page 49, 28 *A.* 329, at page 331, Chancellor Wolcott said:

"Neither does the court of chancery in this state possess [any authority as to the care and supervision of lunatics or insane persons] as a part of its original, inherent, equitable jurisdiction. It is derived from the legislature, just as the chancellor in England derived it from the king by virtue of his sign manual. * * *"

To the statute then, as set out in the statement of facts, we must, therefore, now look. This statute, we find, originally consisted of two separate and distinct parts. The first Delaware statute was passed February 2, 1793 (*Vol.* 2, *Laws of Delaware, p.* 1055). Except for some slight changes in phraseology the statute of 1793 remains as the first two paragraphs of *Sec.* 3091 of *Revised Code* of 1935. These paragraphs are:

"The Court of Chancery shall have the care of insane persons above the age of twenty-one years, so far as to appoint trustees for such persons to take charge of them and manage their estates.

"Before such appointment, the Chancellor shall issue a writ to inquire by a jury and determine whether the person named is insane."

The foregoing paragraphs constituted the full and complete statutory provision covering the pertinent subject matter from 1793 to 1911. From the quoted statute it is quite apparent that the jurisdiction of the Court of Chancery is not, and never has been, of a general and unlimited character, for the statute only gives jurisdiction over insane persons above the age of twenty-one years, and the statutory care is expressly limited by the language "so far as to appoint trustees &c." It is equally clear that the appointment of a trustee was not, in itself, an adjudication or determination of insanity. From 1793 to 1911 the statute expressly required that before a trustee could be appointed that there should be issued a writ, as a separate and preliminary step, for the determination by a jury, of the insanity of the designated person. It is thus apparent that

the adjudication of insanity and the appointment of a trustee were two separate and distinct matters, one of which must precede the other.

In 1911 ( by *Chapter* 138, *Vol.* 26, *Laws of Delaware*) there was added an amendment which substantially constitutes the present concluding paragraph of *Sec.* 3091, *Revised Code* of 1935. It reads as follows:

"Where, however, the person named is at the time of making the application an inmate of the Delaware State Hospital at Farnhurst, the Chancellor may in his discretion appoint a trustee or trustees for such person without. issuing a writ to so inquire by a jury and determine whether the person named is insane; provided, however, that in any case the person alleged to be insane, or any person related to such person within the third degree of consanguinity, may at any time before the appointment of such trustee require that a writ issue to inquire by a jury and determine whether the person named is insane. * * *"

The amendment does not, we think, purport to change the law as to the manner of adjudicating a person to be of unsound mind. The amendment merely provides a more expeditious method for the appointment of a Trustee, to be used at the discretion of the Chancellor. This new method, however, is not available if the person whose sanity is questioned, or any relative within the third degree of consanguinity, objects. In such cases the writ must issue and the determination of the jury be had. All the amendment does is to present to the Chancellor such a *prima facie* showing of incompetency to manage his affairs as, in the discretion of the Chancellor, will allow him to appoint a Trustee if no interested person objects. The statute does not purport to make the fact of a person being an "inmate" of the State Hospital operate as a legal adjudication of insanity. To have this effect it would be difficult to understand the additional adjudication expressly provided by the Statute.

The statute herein discussed must not be confused with the ordinary right of inquiry as to the sanity

or insanity of a person committed to the State Hospital. That right is preserved by an entirely different statute (*Sec.* 3079, *Revised Code* of 1935), and in such inquiry the committment of the person to the hospital raises no presumption against his sanity. We think there has been no legal adjudication of the insanity of Armstrong by virtue of any proven proceedings before the Chancellor.

The plaintiff relies solely upon the appointment of the Trustee by the Chancellor as establishing an adjudication of insanity. As establishing this adjudication of insanity the plaintiff does not rely upon, nor has he proven, any preliminary or prior proceedings whereby Armstrong became an "inmate" of the Delaware State Hospital at Farnhurst which, in turn, was the basis of the appointment of the Trustee. Under these circumstances it does not become material for us to discuss those rather confused statutes relative to the admission of patients to the State Hospital, or the legal or mental status of such patients or inmates. It, therefore, also becomes unnecessary to discuss the legal principle that the finding of a non-judicial Board as to mental condition is not a judgment nor conclusive adjudication of the status of insanity. As to this question many authorities are collected in a note in 108 *A. L. R.* 47.

The reason that the legal adjudication of insanity is of importance is this: Ordinary judicial proceedings bind only those who are parties to it, but proceedings in *rem* may have a wider effect, and inquisitions in lunacy and resultant adjudications have been considered as somewhat analogous to proceedings in *rem. Dewey v. Allgire*, 37 *Neb.* 6, 55 *N. W.* 276, 40 *Am. St. Rep.* 468; *Corbin v. State*, 129 *Fla.* 421, 176 *So.* 435.

Upon the basis of the lack of any proven adjudication of insanity may be distinguished the cases cited by the plaintiff and cases similar to *Fiero v. Franklin Savings*

*Bank,* 124 *Misc.* 38, 207 *N. Y. S.* 235, holding that inquisition and final adjudication in lunacy is notice of such fact to all the world.

In the appointment of a Trustee for Armstrong there was not, we think, such an inquisition or adjudication of insanity as would constitute notice of such fact to all the world, and thus be constructive notice to the defendant bank. This question was suggested, but its decision considered unnecessary, in *Industrial Trust Company v. Miller,* 5 *W. W. Harr.* (35 *Del.*) 554, 170 *A.* 923.

2. The plaintiff contends that the defendant bank had actual knowledge of his appointment as Trustee for Armstrong prior to the payment of the check which is the basis of this suit. Actual knowledge is often a question of fact. As such in the present case it is asserted by the plaintiff, and as vigorously denied by the defendant. With this question of fact we are not directly concerned. Knowledge may also be a mixed question of law and fact, and so we deem it in the present instance. It is knowledge of his appointment as Trustee with which the plaintiff seeks to charge the defendant, rather than with legal notice. The plaintiff admits that he was ignorant of the account which Armstrong had with the defendant bank, so there was no reason for the plaintiff to give the defendant notice of his appointment as Trustee in order to stay any transactions by Armstrong. The plaintiff claims that the defendant acquired knowledge of his appointment as Trustee for Armstrong under the following circumstances: During the year 1937 Mrs. Armstrong, mother of Howard Malcolm Armstrong, was purchasing a house from a client of the bank, and Russell H. Morris, Trust Officer of the defendant, and J. Pearce Cann, Esquire, Vice-President and attorney for the defendant bank, were interested in the legal transfer. The plaintiff contends that as attorney for Mrs. Armstrong he told both Mr. Morris and Mr. Cann that Mrs. Armstrong

had hoped to obtain a portion of the purchase price of the property from the Trustee for her son, and that the appointment of the Trustee was thus brought to their knowledge. Mr. Morris, in particular, denies the information, but we are now concerned with the legal effect of the knowledge if, in fact, imparted. Mr. Morris was the Trust Officer of the defendant, in charge of its Real Estate Department, with no connection or knowledge whatever of its Banking Department. Mr. Cann, while Vice-President and Director of the defendant, was an attorney engaged in private practice in Wilmington, some twelve miles away, and was not actively engaged in any detail management of the Bank. It is not suggested that either Mr. Morris nor Mr. Cann had any intimation that Howard Malcolm Armstrong had an account with the bank, or that the bank was at all interested in his affairs. It would seem that the only business with which Mr. Morris and Mr. Cann were interested was a purchase of a house by Mrs. Armstrong, and that the mention of a Trustee for Howard Malcolm Armstrong, if made, was of a casual or incidental nature, imparted solely as a reason advanced for the delay or non-compliance of the contract of purchase on the part of Mrs. Armstrong.

In *Vol. 3, Fletcher's Cyc. of Corporations, Permanent Ed., Sec.* 793, it is stated:

"The general rule is that knowledge acquired or possessed by an officer or agent of a corporation otherwise than in the course of his employment or in relation to a matter that is not within the scope of his authority is not notice to the corporation."

In the same work at page 789, it appears that the knowledge must be acquired while acting within the scope of his authority and in reference to a matter over which his authority extends.

In 2 *Mechem on Agency, 2d Ed., Sec.* 1844, *p.* 1427, it is said that notice to a president of a corporation is notice to the corporation only when it concerns something which

falls within the scope of his authority, or concerning which he acts as agent with the knowledge in his mind. Notice or knowledge coming to him in his private or unofficial capacity concerning matters in which he does not act as agent for the corporation, is not imputed to it. The same would be still more true, perhaps, of the Vice-President.

In 3 *Thompson on Corporations, Sec.* 1788, *p.* 362, it is said:

"The knowledge which will be imputed to a corporation must be the knowledge of one who is executing some agency for the corporation; and when this proposition is stated the conclusion must follow that the knowledge of one who is acting in a merely ministerial capacity as, for instance, a servant or clerk, will not be imputed to the corporation."

In the present case it does not appear that the suggested transaction directly involved Howard Malcolm Armstrong in any way. A casual or incidental reference to his incompetence made to an officer of the Bank while acting in a private capacity as a lawyer will not charge the Bank with such knowledge. To do so would impute and charge to the officer knowledge of the hundreds or thousands of depositors at the bank, even though he has no connection with or knowledge of such facts. See 1 *Morse on Banking, Sec. III;* 3 *R. C. L.* 476, 477; 7 *R. C. L.* 656; *Mayor &c of N. Y. v. Tenth Natl. Bk.,* 111 *N. Y.* 446, 18 *N. E.* 618; *Black v. First Natl. Bank,* 96 *Md.* 399, 54 *A.* 88; *Marsh, Mervin & Lemmon v. Wheeler,* 77 *Conn.* 449, 59 *A.* 410, 107 *Am. St. Rep.* 40; *Sturdee v. Cuba Eastern R. Co.,* (2 *Cir.*) 196 *F.* 211.

We are of the opinion that the defendant bank had no proven actual knowledge of the appointment of the plaintiff as Trustee for Howard Malcolm Armstrong prior to the payment of the check in question.

3.   In the absence of actual or constructive notice of the appointment of the Trustee for Armstrong what was the effect of the payment of the check?

■ Now of course it is axiomatic that since a contract involves an agreement or meeting of the minds, so every contract to be binding and unimpeachable must have been entered into by parties with minds of sufficient soundness for the purpose. Upon this basis rest the decisions that contracts of a lunatic are void or voidable, and upon this basis rest the decisions that an adjudication of insanity is evidence of the mental state after the adjudication. Most of the cases involving the responsibility of lunatics have arisen by reason of a contract to which such supposed insane person was a party. That is not the situation here. Here the person alleged to be insane had drawn a number of checks upon a bank account which had been established by him while he was ostensibly sane, although for some time previously he had been intermittently a patient at the State Hospital. By the evidence it is made to appear that the check here in dispute was given pursuant to a supposed contract between Armstrong and the payee of the check, for the purchase of a garage, but as to which contract the bank is not shown to have had any knowledge at all. There is no suggestion that any proceedings have been instituted to annul the contract with the payee, nor is there evidence even that the contract has not been completed to the benefit of the lunatic, who now seeks, by his Trustee, to recover from the bank the partial consideration therefor.

■ In *Industrial Trust Company v. Miller, supra,* it was said:

"The general rule is that a contract of an insane person, who has not been judicially adjudicated, is not void, but voidable."

■ The principle entering into this distinction has been the insistence that in certain cases before the contract will be avoided that there shall be a restoration of the status which theretofore existed. The rule is usually stated

"That where a contract has been entered into with an insane person in good faith, without fraud or imposition, for a fair consideration, without notice of the insanity, before adjudication of in-

sanity, and has been executed in whole or in part the contract will not be set aside unless the parties can be restored to their original position."

See cases collected in notes to 46 *A. L. R.* 419 and 95 *A. L. R.* 1442.

The plaintiff relies upon the case of *American Trust & Banking Co. v. Boone,* 102 *Ga.* 202, 29 *S. E.* 182, 184, 4 *L. R. A.* 250, 66 *Am. St. Rep.* 167. That case does decide that a contract with an insane person is void and not voidable, and that a bank is not protected which paid a check of an insane person after an adjudication in another State, but of which adjudication the bank had no knowledge. It must be observed that at the time of decision of the *Boone case,* 1897, a statute of Georgia provided:

"An insane person cannot contract prior to commission sued out and guardianship appointed; that a lunatic may contract during lucid intervals; after guardianship, he cannot."

This same Georgia statute is mentioned in *Fields v. Union Central Life Ins. Co.,* (1930) 170 *Ga.* 239, 152 *S. E.* 237, 238. This statute of course makes every contract of an insane person prior to adjudication void and not voidable, thereby differing from the general rule as adopted by Delaware. Prior to the decision of *Hamilton v. First National Bank of Rome,* (1936) 54 *Ga. App.* 707, 188 *S. E.* 840, 841, the statute of Georgia had been changed to conform to the general rule, as follows:

"The contract of an insane person * * * who has never been adjudicated to be insane * * * is not absolutely void, but only voidable, except that a contract made by such person during a lucid interval is valid without ratification. * * *"

Of equal or superior relevancy are the cases of *Reed v. Mattapan Deposit & Trust Co.,* 198 *Mass.* 306, 84 *N. E.* 469, and *Leighton v. Haverhill Savings Bank,* 227 *Mass.* 67, 116 *N. E.* 414, and *Riley v. Albany Savings Bank,* 36 *Hun* 513, *affirmed,* 103 *N. Y.* 669. These cases hold that where a bank deposit is made by a person who is sane and

who subsequently draws checks upon the account, the bank will be protected in the payment of the checks even if at the time of payment the depositor be insane, provided the bank had no knowledge of such insanity, or could not be charged with such knowledge. The cases support the clear principle that upon the making of the deposit the relation of debtor and creditor between the bank and the depositor came into existence. When the check of the depositor was presented for payment no new contract came into being between such depositor and the bank, such as would require the bank to ascertain the then mental status of the depositor, but the payment of the check was the mere formal completion of the pre-existing contract which the bank had entered into with one who was sane. See also *Brady on Bank Checks, Sec.* 205, *p.* 335; 6 *Zollman on Banking, Sec.* 3793; 5 *Michie on Banking, Sec.* 173; 8 *Michie on Banking, Sec.* 15; 1 *Morse on Banking, Sec.* 319. As said in *Riley v. Albany Savings Bank* (*supra*) "a bank cannot investigate the sanity of a depositor whenever a check is presented."

In *Metropolitan Life Ins. Co. v. Bramlett,* (1932) 244 *Ala.* 473, 140 *So.* 752, the Court considered both the *Boone case* and the *Massachusetts cases,* and approved the latter. The Court cited with approval the quotation from *Brady on Bank Checks, Sec.* 205:

"If a depositor after opening an account becomes insane and draws checks while insane or if he draws checks while sane and becomes insane before the checks are presented the drawee bank is protected in either case if it pays the checks in good faith and in ignorance of the drawee's insanity. Unless there are facts presented putting the bank on notice it is under no obligation to investigate or assure itself of the drawee's sanity."

We have carefully examined the testimony concerning the mental status of Armstrong. To Mr. Murray, the teller of the bank who received the deposit on March 11, 1937, there was nothing out of the ordinary, and Armstrong seemed perfectly sane. He saw him a number of

times during the summer and had no intimation of any incompetency. Dr. Tarumianz, Superintendent of the State Hospital, saw Armstrong September 1, 1937, and October 2, 1937. Using these dates as a basis he testified that on September 23, 1937, the date of the check, he believed Armstrong was "legally sane but psychiatrically he was not" and that there was nothing in Armstrong's manner or action to put a non-professional man upon his guard or to give the impression that Armstrong was a mental case.

Upon a careful review of both the law and the facts, we are of the opinion that judgment should be entered for the plaintiff solely for the amount admitted by the defendant to be due and paid into the Registry of this Court.