Caroline RENDLEN, Plaintiff,

v.

Robert T. RENDLEN et al., Defendants.

Raymond G. RENDLEN, Jr., et al., Plaintiffs,

v.

Robert T. RENDLEN et al., Defendants.

Caroline RENDLEN, (Plaintiff) Respondent,

v.

Robert T. RENDLEN, (Defendant) Appellant.

No. 49626.

Supreme Court of Missouri,

Division No. 2.

April 8, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied May 13, 1963.

William B. Spaun, Hannibal, for appellant.

Ely & Hibbard, Hannibal, Gustave H. Hoelscher, Richmond, Ind., of counsel, for respondent.

BARRETT, Commissioner.

This appeal involves one phase of the marital and financial difficulties of Robert and Caroline Rendlen, who, from August 31, 1940 to August 30, 1960, were husband and wife. Initially there were two separate suits in Marion County, one by Caroline, probably an equitable garnishment, against Robert and his present wife LaVerne and his brother Raymond in his capacity as executor of the will of their mother Nathaline Rendlen. The second suit was by Raymond as executor against Robert, LaVerne and Caroline and was for the purpose of finally settling and distributing Nathaline's estate. These two suits were consolidated and there were numerous answers, interpleas and motions, the first 94 pages of the record consist of these

pleadings. But in view of Robert's brief upon this appeal it is not necessary to even summarize the various issues raised by these numerous pleadings. On May 3, 1959, in circumstances to be noted, Robert executed two documents in one of which he assigned to his then wife, Caroline, one half of his interest in his mother's estate, and in the other conveyed to her a one-fourth interest in his grandmother's property known as 115–117 N. Main Street in Hannibal. At the same time, and in consideration of his executing these documents, Caroline dismissed an action for divorce, together with a restraining order, then pending against Robert in St. Louis County. Upon the trial of these consolidated actions the court, for the most part, found the issues for Caroline and against Robert. But upon this appeal Robert briefs and argues but one question—whether the assignment and conveyance from him to Caroline were the result of undue influence. It is, therefore, necessary to relate only such of the facts and circumstances as bear upon this single issue, noting in passing, however, that the court has painstakingly considered all the pleadings, the evidence and the exhibits.

Caroline, the daughter of Judge Gustave H. Hoelscher, for thirty-eight years a circuit judge, and Robert were married at Caroline's home in Richmond, Indiana, August 30, 1940. Robert and Caroline now have two children, Clare Ellen, 15, and Robin T., 12. When they were first married Robert was employed by GMAC and they lived in Dyersburg, Tennessee, Decatur, Illinois, and Detroit, Michigan. In 1946 they moved to Hannibal and Robert was in business with his father in the Rendlen Motor Company, a Chevrolet agency. Robert may have been engaged in some other enterprises also, and in the meantime they may have lived elsewhere, but he says that when first employed by the Rendlen Motor Company he had a salary of $300 a month, plus bonuses, and by 1949 was making $18,000 to $20,000 a year. Robert was a very heavy drinker, by his own admission, since his

father's death in 1954, he usually drank from a pint to a fifth of liquor a day, sometimes more. He has always had the reputation, however, of being able "to carry his liquor," and he says that he was seldom drunk,—"I would not say drunk but certainly feeling no pain." But after his father's death, Robert managed the Rendlen Motor Company and, in addition, had a substantial interest in and income from the estates of his mother and grandmother.

It is not necessary to set forth the details, it is sufficient to say, probably by reason of Robert's "poor management" or lack of judgment, that after 1951 the Rendlen Motor Company lost money and finally lost its Chevrolet franchise. In 1956 the Rendlens moved to St. Louis County and Robert worked for several concerns, formed the R & F Machinery Company, "but it didn't pan out." They lived beyond their means, finally mortgaging the household furniture to a small loan company for a loan of $1,150 and incurred other debts. And finally their personal relationship deteriorated, Robert became "surly and overbearing and unpleasant," told Caroline to take the children and go home. Near the first of April 1959, he claimed to have a job with fine prospects in Florida and took Caroline to Tampa on what he said was a "company expense trip" to buy a house, and he did pay $750 down on some property. Caroline was not then aware of the fact but, through an assignment against his inheritance, Robert had obtained a loan of $5,000 from a St. Louis County bank.

They returned to St. Louis County and Robert flew on to Cincinnati. It was then that the climax came, "checks were bouncing right and left," the people Robert had dealt with in Florida and elsewhere were demanding that he meet his obligations. Caroline consulted the Rendlen lawyers in Hannibal, Robert's second cousins, and his brother Raymond, and for the first time discovered and understood Robert's true financial situation, including the fact that he was rapidly dissipating his inheritance.

She returned to St. Louis County and employed John F. Nangle of Clayton to institute a suit for divorce from Robert, at the same time enjoining him from transferring or encumbering any interest he might have in any real or personal property. Robert's brother Raymond advanced $100 and on April 28, the day summons was served on Robert, Caroline took the children and returned to her father's home in Richmond, where they have since resided.

The next day Robert called Caroline in Richmond, he was "displeased over my leaving without discussing the divorce." There were several telephone calls, he first wanted her to return to Kirkwood and bring the children, and finally it was agreed that "I should return and discuss things and that my father should come with me—that was by his request. He wanted someone reasonable to discuss this with." And in a day or so Judge Hoelscher and Caroline left Richmond, stopping first in Hannibal. There, after talking with Raymond and the Rendlen law firm, Judge Hoelscher was "shocked" to learn of Robert's true financial condition, that he had lost at least $100,-000 in the Rendlen Motor Company, and was rapidly dissipating his interest in the estates of his mother and grandmother. Judge Hoelscher examined some of the records in the Probate Court, obtained from Branham Rendlen a legal description of the Main Street property and that night in Raymond's home drafted in longhand the documents involved here,—the assignment from Robert to Caroline of the interest in his mother's estate and the conveyance to her of an interest in the Main Street property. He then called Robert and made an appointment to see him in St. Louis County the following day.

Robert had made a reservation for Caroline and her father at a motel, and the next day, May 2, 1959, after checking in, they met Robert at their former residence about eleven o'clock. There were several conferences or meetings but the upshot of the matter was that, on May 3, Robert called a notary public and executed the documents Judge Hoelscher had prepared. Caroline in turn executed a dismissal of her divorce suit, which included, of course, the injunction. Judge Hoelscher put the executed papers in his pocket, at Robert's request they were not to be delivered until the following day, and Bob, "perfectly happy," said " 'Well, now, let's have a little drink, a social drink,' and we did." In the meanwhile Robert was to consult his friend Irwin, and perhaps others. The next morning Judge Hoelscher and Caroline appeared at Nangle's office, Robert, as he had announced the previous day, was not present. Robert's lawyer, Don Flint, was there, John Mitchell, Clayton banker, was there, and of course Mr. Nangle. Judge Hoelscher produced the signed documents, Nangle examined them, and at Flint's request they went across the hall to his office and he made copies of the assignment and conveyance. On May 5, in accordance with her agreement, Caroline's lawyer filed a dismissal of the divorce action. In the afternoon of May 3, by prearrangement with Robert, they went to the house again, Caroline to get a few things and "to take care of closing the house" (it already had been sold) and make arrangements to send Robert's clothes wherever he directed. Robert had a job in Florida, so he said, "and he was going to make good and he was in high hopes of making good; in fact, he convinced my father that he would too, and we parted the best of friends." Robert produced a roll of bills, gave her $200 to replace a check that had "bounced" and Judge Hoelscher and Caroline returned to Richmond.

Before proceeding directly to the problem involved but to place it in context, it is necessary to briefly round out the story. Robert did not proceed immediately to Florida, he remained in Missouri a few days, took a vacation on a lake in Kentucky and then went on to Florida. And his stay in Florida did not turn out well, eventually there were bad checks and numerous other problems. He was to return to St. Louis on a certain

plane but failed to show up at the appointed time. By July 27 it was necessary that someone make a trip to Florida to extricate Robert from his difficulties, he was returned to Hannibal and committed to Fulton as a mentally ill person in need of treatment. While there he and Caroline exchanged several letters, at first he told her of his plans for "starting a completely new life from scratch," said that he had quit drinking and intended eventually to move to Florida. But by the time he was to be released from the hospital wrote (June 4) Caroline, "I also feel that your 'moral support' is too little and too late to be of any help to me. My success and happiness therefore must be of my own doing." In June 1960 Caroline instituted an action for divorce against Robert in Wayne County, Indiana. The summons was returnable on August 17, on that day a default was entered, and on August 30, 1960, Caroline was given a final decree of divorce and custody of the children. On August 7 Robert wrote the clerk of the Indiana court asking for a "certification of divorce proceedings," and on August 18, in Corinth, Mississippi, was married to LaVerne and they were residing in Joplin when this case was tried in May 1962.

But in this background, as stated, there is now but a single question. Upon this appeal Robert claims that the assignment and conveyance were procured by undue influence. The totality of his argument is best summarized by this quotation from his brief: "The action of the plaintiff and her father, a learned Circuit Judge, acting in a confidential relationship with defendant Robert T. Rendlen, and by their carefully laid plan to elicit the support of his family, his attorney, and his close banking advisor, taking advantage of his drinking, pressures on him of a financial nature, pressure of his domestic difficulties, his natural love for his children, and his desire for a reconciliation were such pressures and undue influence as to destroy the free will of the defendant, and substituted the will of the plaintiff and her father, and the assign-

ments and conveyances made at such time should be vacated and set aside."

 It is not necessary to consider the record in detail and analyze the evidence with respect to each of these assertions. Neither is it necessary to review the cases and literature, it is sufficient to say in passing that as a practical method of resolving serious marital difficulties husband and wife have the capacity to make a separation agreement, including provision for continued separation or in consideration of the dismissal of a pending action for divorce. 17A Am.Jur., Divorce & Separation, Secs. 883, 885, 889–891, 893, pp. 71–81. Needless to say, a separation agreement procured by the undue influence of either of the parties is subject to being set aside. 17A Am. Jur. Sec. 898, p. 85; 26 Am.Jur., Husband & Wife, Sec. 270, p. 878; 41 C.J.S. Husband & Wife § 162, p. 643; Lewis v. Lewis, 354 Mo. 415, 189 S.W.2d 557; 2 Restatement, Contracts, Sec. 497; Peine v. Sater, Mo., 289 S.W.2d 101. And a husband and wife living together may be in a confidential relationship, but separated with a divorce action and an injunction proceeding pending they are antagonists. 17A Am.Jur. Sec. 898, p. 85. Robert now limits the authority of his lawyer, Don Flint, nevertheless both Caroline and Robert had other counsel, and of course Caroline had her father, and even though he may not have made the most of his legal counsel, the fact that he was represented by a lawyer and had other outside advice indicates that there was no confidential relationship when these documents were executed. 17A Am.Jur. Sec. 898, p. 86. In this connection there is no evidence of a carefully laid plan "to elicit the support of his family, his lawyer." By the time this case came on for trial Robert was estranged from all his family and friends in Hannibal and did not turn to any of them for advice. As he said of his brother Raymond, "ever since I left Hannibal * * * our relations were very strained and there were many things including the distribution of the estate, that we did not see eye to eye." It may be that some of his family and

friends were dogmatic and, in fact, had but little sympathetic insight into Robert's basic problems, but they were not part of a conspiracy and violated no personal relationship with him. There was talk of a reconciliation but is not necessary to record the details, there were no overtures on Robert's part, his idea was that "the whole matter was left to her discretion."

■ Even as to the basic issue of undue influence it is not necessary to relate the circumstances and point out the permissible inferences. Judge Hoelscher was shocked when he learned the facts and he said, "Yes, it looked to me like this money was going away fast and I thought I had better get something for my daughter and the children while the getting was good. This was the only chance that I had and so I went to Bob and put it up to him." As to the assignment and conveyance he said, "I drew up those papers on my own accord without any suggestion from anybody else." As to the negotiations and the final signing of the documents, he said Caroline and Robert first talked alone in an adjoining room and then they all started talking about settling the divorce and "he wanted the suit dismissed." In response Judge Hoelscher took the papers from his pocket and said, "Here is a deed for your one-fourth interest in the property in Hannibal and here is an assignment for a one-half interest in your mother's estate. Now you look at them and read them over. What we want is a property settlement. We think this is fair and it is about one half of the property in these two estates and if you will give Carol that property she will dismiss her suit against you." Robert read the papers, threw them on the table and said, "I will not sign them." Judge Hoelscher replied, "All right that's your business if you won't sign them." Robert proposed that the property be put in a trust for the benefit of the children. That proposal was rejected and again Robert said that he would not sign the judge's papers. Whereupon the judge announced that they would

go home, and put his hat on and started out the door. But Robert suggested a further conference and Caroline and her father went to dinner and returned that evening. In the meantime Robert had talked to a banker friend and was ready to sign the papers. He called a notary, had him come to the house and the notary acknowledged the conveyance.

Robert's version of the execution of these documents was not too much different from that of his wife and her father. He said that during the afternoon "We were discussing, of course, the settlement, that is, the assignment and dropping of the divorce suit." He said that there was no definite agreement as to a reconciliation and now he places this emphasis upon the transaction and its circumstances: "Well, I had this choice: I either signed them or they went on with the divorce." Admittedly, he understood the nature of the papers he was signing and their effect, and he said, "I understood one thing—that it meant the dropping of the divorce action." As to the pressures, he had this to say, "Well, there was pressure practically of every sort. This divorce situation occurred. When the children were taken from the State of Missouri, *the estate was in such shape that I could get no money from the estate*. (Emphasis supplied.) It had been in probate, I thought, way too long and I was under pressure from the forming of the new company trying to get it going on a shoe-string. * * * [A]nd all these pressures were quite great believe me." He now says that he was "then" interested in getting his family back together and that was the reason he signed the documents,—"at that time," he said, "If he would have asked for the whole thing he could have gotten it."

Judge Hoelscher and Caroline were not of course wholly unmindful of these pressures, and the judge was not unaware of the role he had to play in concluding the matter. As to his drafting of the documents and their provisions and as to the presence of Robert's lawyer in the negotiations, he had this to say: "He could be there. He

was Bob's attorney. I was presenting my proposition. He could consult and advise with Bob. I knew how to carry out my end of it." And he had this insight into Bob's changing his mind and finally signing the documents on May 3: "He wanted this suit dismissed so he could get some more money on his assignment to the Clayton Bank of his interest in the personal estate of his grandmother. That's why he signed the assignment and the deed and for no other reason, so that he could go ahead and get more money. (And, it may be interpolated, the following day he got an additional $2,000 from the bank.) * * * I know what he wanted us there for,—he was broke—he didn't have a dime—Bob Rendlen would never have telephoned me and Carol to come out there unless it was to his advantage. He needed money and he wanted us to come out so that he could get rid of that injunction in the divorce suit so that he could get his mitts on more money."

Obviously there were pressures and no doubt "they were quite great," and his antagonists in bargaining were aware of them. And it may be that such pressures had a large part in compelling action, may even have resulted in a bad bargain (Hollocher v. Hollocher, 62 Mo. 267, 272), and in that sense constitute some form of influence, but they do not comprise the pressures of undue influence that in equity demand the setting aside of a transaction. Crenshaw v. Crenshaw, 276 Mo. 471, 208 S.W. 249; Farrow v. Farrow, Mo., 277 S. W.2d 532; Murray v. Murray, Mo., 293 S. W.2d 436; Walton v. Van Camp, Mo., 283 S.W.2d 493. And, accordingly, the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.