JAMES, Judge:
Action by petitioner to rescind the separation agreement he and his former wife, respondent S.I.S., executed on February 20, 1975.
Petitioner and respondent were married on January 19,1957, and four children were bom of this marriage. Petitioner’s mental health problems began in 1970 when he was hospitalized at the Delaware State Hospital for eight weeks. Similar illnesses occurred in 1972 and the early part of 1974, with petitioner suffering such symptoms as acceleration of the mind followed by paranoia and loss of a sense of reality. During the two to three day onset of the illness, petitioner generally becomes violent toward himself, but not other people. After commitment, and drug therapy, petitioner slowly comes down from this state of aggressiveness, begins to communicate with others and, according to psychiatric testimony, becomes extremely dependent. After release from the hospital, petitioner usually continues to take medication for thirty to ninety days. Petitioner has been diagnosed as suffering from schizophrenia, paranoid type, and manic-depression.
*255 On December 23, 1974, petitioner suffered a reoccurrence of this illness and was committed again to the Delaware State Hospital by police after being called by respondent. At this time, petitioner was employed by Hercules as a design engineer at a yearly salary of approximately $21,000. Although petitioner claims there had been no marital discord prior to the December 23, 1974 mental breakdown, respondent testified that she consulted an attorney in March of 1974, during petitioner’s previous reoccurrence of this illness, for the purpose of securing a legal separation. However, petitioner pleaded with her to stay with him and she agreed if he promised to take his medication. In any event, respondent filed for a divorce in Superior Court[1] alleging the mental illness of petitioner as the sole ground for the action, and petitioner was personally served with the divorce summons on January 10, 1975, while still committed to the Delaware State Hospital.
Petitioner told respondent that he did not want the divorce and he was referred, by the hospital’s patient advocate, to an attorney with whom he had a very brief consultation on January 16, 1975, the details of which are the subject of some dispute. However, all parties agree that petitioner was primarily concerned with returning to the marital home and reconciling with respondent. While there may have been some discussion as to what property petitioner owned, he did not discuss with the attorney any type of proposed written separation agreement between petitioner and respondent. Although the attorney indicated he was willing to take the case, petitioner never followed up on the initial visit.
The separation agreement which is the subject of the current dispute was prepared by respondent’s attorney and signed by petitioner on February 20, 1975 at her attorney’s office, at her request. Petitioner never spoke with respondent’s attorney about the contents of the agreement, nor did petitioner read it in the office prior to signing the document. It is clear that petitioner was not independently represented by counsel when he executed this agreement, although at the time he was still committed to the Delaware State Hospital in the night hospital program, under which he left during working hours to attend his job and returned to the hospital at night for continuing treatment. Both petitioner’s testimony and the hospital records indicate that he was working with only mild success during this period. He complained of being very stiff and unable to sit or concentrate for any length of time,[2] often returning either to the hospital or to his grandmother’s house after only a few hours on the job.
Throughout February 1975, petitioner continued on extensive medication, and the hospital records reveal that on the date he signed the separation agreement he was given Akineton, Berolla C and Esidorex, medications which adversely affected petitioner’s reasoning powers.
During his hospitalization from December 23,1974 and until his discharge on February 26, 1975, petitioner was dependent upon respondent for transportation, cigarettes, money to spend and permission to leave the hospital and to return home. Furthermore, she took over his paycheck and ran the family during the course of his illness. Since petitioner did not want respondent to proceed with the divorce action, he testified that he was extremely cooperative toward her during the time when the separation agreement was executed in hopes of reconciling the marriage.
The major factual dispute centers around petitioner’s knowledge and comprehension of the terms and conditions of the agreement prior to its execution, and his participation, if any, in establishing its contents.
Respondent testified that the $750 per month child support figure was established by petitioner after negotiations between them. She also indicated that during the *256 week prior to the signing of the agreement, she and petitioner sat at the kitchen table and went over a draft of the entire separation agreement. The secretary of the respondent’s attorney testified that it was office procedure that a party to the agreement would be given an original copy; however, she could not recall whether petitioner, in fact, received one.
Petitioner admits having conversations with respondent, but claims the discussions dealt only with child support, the Bethany Beach property and the Heritage Park (marital) home. Specifically, he indicated that he wished the beach property and would give the marital home to respondent; but she insisted on the beach property and, after he agreed, she also insisted on occupying the marital home with the children until the youngest reached 19. He denies setting the $750 monthly child support figure, although he does remember that respondent originally asked for $1,100 out of his $1,300 net monthly income. He further claims he did not read the separation agreement before signing it and signed it as an act of good faith and a first step toward reconciliation. In fact, he insists that he never received a copy of the agreement until August of 1977 when he requested a copy from respondent’s attorney.
Petitioner did meet with respondent’s attorney at his office on March 31,1975, when settlement was made on the sale of the Marshallton property, which had been previously inherited by petitioner. The net sale proceeds were first applied to pay off the marital debts and then the balance was divided equally between petitioner and respondent.
Petitioner was released from Delaware State Hospital on February 26, 1975, six days after the agreement was signed, and subsequently lived with his grandmother. Within a few months, he was laid off by Hercules and next secured employment at Franklin Mint, as an outside contractor, through August of 1975. He then worked for Beloit Corporation in Dowington, Pennsylvania until it was sold in April of 1977, and he was transferred to Wisconsin with the successor corporation where he continued until July of 1978 when he was terminated as a result of a reoccurrence of his illness in January of 1978. This most recent illness was precipitated by his father’s sickness and resulted in petitioner’s commitment to Delaware Division, with subsequent transfers to Delaware State Hospital and Rockford Center until the end of February 1978, when he was discharged to live with his father in Temperanceville, Virginia. Fortunately, petitioner’s last employer agreed to continue paying him his $24,000 annual salary until December of 1978.
Following his discharge from the Delaware State Hospital on February 26, 1975, petitioner began sending respondent a mortgage payment of $155, plus child support of $750 for a total of $905 each month for approximately two and a half years, until August of 1977, when he unilaterally reduced the $750 child support payment by one-fourth upon learning that his child support obligation under Delaware law ceased when a child reached 18.
The Court must answer the following questions in order to resolve the issue of the validity of the February 20,1975 separation agreement: first, whether petitioner had the legal capacity to contract on that date; second, assuming that he did, in fact, have capacity, whether the agreement should be rescinded as a result of either constructive fraud or undue influence on the part of respondent.
Only competent persons can make a contract, and where there is no capacity to understand or agree, there can be no contract. 17 Am.Jur.2d Contracts, § 16. See also 41 Am.Jur.2d Incompetent Persons, § 71; Hillsdale Nat. Bank v. Sansone, 11 N.J.Super. 390, 78 A.2d 441, 24 A.L.R.2d 1374 (1951).
Although petitioner was still under commitment to Delaware State Hospital at the time of execution of the separation agreement, he had not been judicially adjudicated mentally incompetent, and therefore the agreement is not void but may be *257 voidable. Industrial Trust Co. v. Miller, Del.Super., 170 A. 923 (1933); Poole v. Newark Trust Co., Del.Super. 8 A.2d 10 (1939).
The mental incapacity sufficient to permit the cancellation of an agreement must render the afflicted individual incapable of understanding the nature and effect of the transaction. 13 Am.Jur.2d Cancellation of Instruments, § 13; Sutcliffe v. Heatley, 232 Mass. 231, 122 N.E. 317 (1919). The Court must determine whether his mental faculties have been impaired to such an extent that he is unable to properly, intelligently and fairly protect and preserve his property rights. Monroe v. Shrives, 29 Ohio App. 109, 162 N.E. 780 (1927).
At the time of the execution of the separation agreement not only was petitioner a diagnosed paranoid schizophrenic still receiving in-patient treatment, but he was also receiving significant amounts of “anti-psychotic” medication. The only psychiatrist to testify, Dr. S, treated petitioner in February of 1978, and based his testimony upon direct knowledge of petitioner and a review of the existing medical records. Dr. S’s opinion, based upon reasonable medical certainty, was that when petitioner executed the separation agreement on February 20, 1975, he would not have been fully able to understand or comprehend what he was signing nor the implications thereof. At the time of the signing, petitioner was just emerging from an acute state (psychotic decompensation) through the use of medication. Most significantly, the drugs administered to petitioner tranquilize the nervous system and permit reality orientation; however, they also adversely affect reasoning ability. Dr. S concluded that petitioner may have thought he knew what he was doing when, in fact, he did not; petitioner would neither have fully understood a complicated document nor would his value judgment have been sufficient to comprehend the effect of the transaction.
Delaware courts have held that mental incapacity, resulting from the use of drugs, may furnish a ground for voiding a contract, Poole v. Hudson, Del.Super., 83 A.2d 703 (1951); however,
“[ I]f no circumstances of unfairness, fraud, duress or undue influence appear, the reasoning powers must be so impaired as to render the person actually incapable of comprehending and acting rationally in the particular transaction. Warwick v. Addicks, 5 W.W.Harr. 43, 157 A. 205 (1931); 17 C.J.S. Contracts, § 133, page 479.” Poole v. Hudson, supra, at 704.
The facts of this case do not require this Court to make the extremely difficult decision as to whether petitioner was, in fact, incapable of comprehending and acting rationally in executing the separation agreement. For even if the mental weakness of the petitioner in this case did not rise to the level of contractual incapacity, such weakness is a circumstance that operates to make the separation agreement voidable when coupled with the evidence of lack of independent counsel, undue influence and unfairness in the transaction that is present in this case.
41 Am.Jur.2d Incompetent Persons, § 95 states as follows, at 633:
“The elements of fraud, undue influence, and knowledge on the part of the person participating in a transaction that the other party thereto is afflicted mentally are material in many instances where the validity of a contract or deed executed on such a transaction is questioned. For example, even though the mental infirmity of a party to a contract, or the grantor in a conveyance, is not of such a degree as in itself to render the contract void or voidable, if the nature of the contract or the conveyance justifies the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning, artifice, or undue influence and it appears that the other party was guilty of fraud or bad faith or imposed upon the infirm person by taking advantage of his infirmity to secure from him a contract or conveyance that he otherwise would not have executed the contract or conveyance may be set aside.”
*258 It has been said that the law presumes fraud on the part of an individual who contracts with a person who was laboring under a disability such as mental weakness at the time the contract was made. 41 Am.Jur.2d Incompetent Persons, § 95; Holland v. Barnes, 53 Ala. 83 (1875). Constructive fraud may result from taking unfair advantage of another person’s mental deficiency. Baird v. Howard, 51 Ohio St. 57, 36 N.E. 737 (1894).
It is undisputed that respondent had knowledge of petitioner’s mental illness. Beyond the fact of the illness, she knew both the diagnosis and the normal course of petitioner’s infirmity. Indeed, she had authorized his release from Delaware State Hospital so that he could execute the agreement. Whether or not she was aware of the particular medication that petitioner had taken on the date of the execution of the agreement, the Court finds that she knew he was undergoing extensive drug therapy. However, there appears to be no fraudulent intention on the part of respondent. Nevertheless, the peculiar susceptibility of petitioner due to his mental weakness, coupled with respondent’s knowledge of this infirmity, imposes upon her a higher responsibility and requires that the transaction be viewed with suspicion. 25 Am. Jur.2d Duress and Undue Influence, § 37. Such suspicion is particularly warranted where the weaker party has not been protected by the proper independent advice of competent counsel disassociated from the interest of respondent so as to be in a position to advise the petitioner impartially and confidentially as to the-consequences to himself of the proposed agreement. See: Post v. Hagan, 71 N.J.Eq. 234, 65 A. 1026 (1907); Hickman v. Hickman, N.J.Chanc., 121 A. 728 (1923); Giacobbi v. Anselmi, 18 N.J.Super. 600, 87 A.2d 748 (1952).
Close scrutiny of the circumstances surrounding the drafting and execution of the separation agreement, and a look at its contents, present almost textbook evidence of the elements establishing undue influence.
Undue influence is an excessive or inordinate influence considering the circumstances of the particular case. The degree of influence exerted, to be considered undue, must subjugate the free agency of the person influenced to the will of another. Conner v. Brown, 39 Del. 529, 3 A.2d 64 (1938).
“The essentials of undue influence are a susceptible testator, opportunity to exert influence, a disposition so to do for an improper purpose, the actual exertion of such influence, and the result demonstrating its effect.” Id. at 71; 25 Am. Jur.2d Duress and Undue Influence, § 36.
The facts set forth above establish petitioner’s susceptibility to influence. There can be no question that there was a confidential and fiduciary relationship between the parties in view of their long marriage and the respondent’s running of the family during petitioner’s periodic mental breakdowns. Furthermore, petitioner’s testimony revealed that when he signed the agreement, he did so in hopes of reconciling the marriage and avoiding the divorce.
In view of petitioner’s mental instability and strong desire to return to the marital home, it is clear that respondent was the dominant party in the relationship at the time of the signing of the agreement.
“Confidential relations are presumed to exist between husband and wife. . Confidential and fiduciary relations have the same meaning in law; and as every fiduciary relation implies a condition of superiority of one of the parties over the other, equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites.” Peyton v. William C. Peyton Corp., 2 Del.Ch. 321, 7 A.2d 737, 747, 123 A.L.R. 1482 (1939).
The presumption of undue influence is present where, as here, the dominant party obtains a contract. Therefore, she has the burden of proving fairness. Swain v. Moore, Del.Ch., 71 A.2d 264 (1950). The *259 test in such a situation is whether the separation agreement is fair and equitable, having regard for petitioner’s material interests. Brown v. Mercantile Trust & Deposit Co., Md., 40 A. 256 (1898). Respondent has failed to meet this burden. The agreement goes far beyond that which would have been ordered by this Court.
The initial support agreement was for $1,000 out of the $1,300 monthly net pay of petitioner. Following the divorce, the $750 monthly child support plus $155 monthly mortgage payment bring the total charges to about 70% of petitioner’s salary, and the support payments, subject to annual cost of living increases, are not deductible by petitioner nor taxable to respondent. Additionally, petitioner’s support obligation extends until each child reaches 21 rather than 18.
As to the property division controlled by the agreement, respondent immediately obtained sole ownership of the parties’ beach property, which had approximately the same equity as the marital home. Petitioner’s right to the marital home is subject to the respondent’s right to live there until the youngest child reaches 19. Furthermore, petitioner’s interest in the home is subject to forfeiture if he becomes totally disabled or incapacitated, which is stipulated to mean if petitioner’s income decreases to at least 50% of the salary he earned at the time of the execution of the agreement. In view of petitioner’s reoccurring mental illnesses, which adversely affected his employment, it is extremely likely that respondent’s attorney would have the opportunity to exercise this forfeiture option.
Petitioner has the further obligation to maintain medical and hospital insurance on respondent and the children plus responsibility for the children’s extraordinary (“more than $25 for any single^ visit or treatment of any specific condition”) medical, dental or optical expenses.
By its terms, this agreement severely overreaches the obligation of the petitioner to either respondent to their children. Respondent in this situation clearly has received a benefit at the expense of the mentally ill petitioner. Her attorney drew up the agreement and she persuaded petitioner to accept its terms, or to sign it without in-depth knowledge of its import to him. The means of her control over him are not important, and it is irrelevant whether they consisted of importunities, overpersuasion, or moral coercion of any kind. 25 Am. Jur.2d Duress and Undue Influence, § 36.
A separation agreement procured by the undue influence of either of the parties is subject to being set aside. 41 Am.Jur.2d Husband and Wife, § 272; Rendlen v. Rendlen, Mo., 367 S.W.2d 596 (1967).
Applying the foregoing facts to the applicable law, the Court concludes that the separation agreement dated February 20, 1975 should be cancelled and declared a nullity and the parties restored as closely as possible to their status quo at the time of execution.

. Superior Court had jurisdiction over divorce actions at that time. Throughout the course of events described in this opinion, Respondent’s attorney was other than her present attorney upon the petition to rescind.

. The psychiatric testimony confirmed that these symptoms were side effects of the medication petitioner was given to control his illness.