**Larry N. McALLISTER, Plaintiff,**

v.

**Pearl D. SCHETTLER, and Suzanne V. Lord, Guardian of the person and property of Pearl D. Schettler, Defendants.**

**Civ. A. No. 844–K.**

Court of Chancery of Delaware, Kent County.

Submitted: Aug. 13, 1986.
Decided: Dec. 2, 1986.

---

Glenn E. Hitchens, of Morris, James, Hitchens & Williams, Dover, for plaintiff.

Barry W. Meekins and John S. Grady, of Dover, for defendants Pearl D. Schettler and Suzanne V. Lord.

## OPINION

BERGER, Vice Chancellor.

This is the decision, after trial, in an action brought by Larry N. McAllister ("McAllister") seeking specific performance of a contract for the purchase of a farm located at County Roads 94 and 138, Kent County, Delaware. Defendants are Pearl B. Schettler ("Schettler"), an elderly widow who is the owner of the farm and Suzanne V. Lord ("Lord"), Schettler's grandniece and the court appointed guardian of Schettler's person and property.

It is undisputed that McAllister and Schettler executed a sales contract in December, 1983 for the 290 acre farm. Under the terms of the contract, the total purchase price of $425,000 was to be financed as follows: $5,000 earnest money; $350,-000 first mortgage from Federal Land Bank; and $75,000 second mortgage from Schettler for 20 years at 10% interest.[1] Other terms of the contract required Schettler to deliver the property free and

---

1. These amounts add up to $430,000. Since the purchase price is $425,000, the earnest money presumably would go to closing or other costs leaving the purchase price 100% financed.

clear of all leases or assume liability as to any existing leases for the difference, if any, between the lease terms and $100 per acre for 240 acres. She was also required to pay up to $7,500 of McAllister's settlement costs as well as a broker's commission of $35,000.[2] Final settlement was to be held on or before January 15, 1984, but Schettler was entitled to retain possession of the home until June 30, 1984.

Schettler has had no role in this litigation. In April, 1984 she was placed in the Kent Convalescent Center. There is no dispute that she is suffering from senile dementia and has been incompetent since at least April. Lord, as the guardian of Schettler's person and property, argues against specific performance on the alternative grounds that (1) Schettler was incompetent at the time she signed the sales contract, or (2) under all the circumstances, including Schettler's deteriorating mental condition, the allegedly unconscionable terms of the contract and undue influence, it would be inequitable to grant the relief sought. For the reasons that follow, I find that Schettler had contractual capacity when she signed the contract, but that the facts of this case do not warrant the relief of specific performance.

## I.

The following is a summary of the relevant facts, as I find them, based upon the credible evidence adduced at trial. Schettler, now 88 years old, had been living alone on her farm of approximately 290 acres for many years prior to the events at issue. She has no children and it appears that Lord, her grandniece, is the person with whom she has had the closest family relationship over the years. Lord describes Schettler as a domineering woman who always seemed to know what she wanted to do and Lord acknowledged that, from time to time, Schettler would say that she was lonely and that she ought to sell the farm and move to town.

For purposes of this action, Schettler's relationship with Joseph Hill ("Hill") and his family also should be noted. The Hills own a farm a few miles from the Schettler farm. For most of the past 12 years, Hill and his father tilled Schettler's land under a lease arrangement. In addition to his business relationship with Schettler, between 1978 and 1983, Hill took a personal interest in Schettler's care. He did chores around the house and generally checked on Schettler to see if there was anything she needed. Schettler apparently appreciated these attentions since she included Hill in one or more of her recent wills.

The events that precipitated this lawsuit began in the summer of 1983. William David Simpson ("Simpson"), a local real estate broker, had been aware since 1981 that Schettler might be interested in selling her farm. On August 1, 1983, Simpson testified that he had a potential purchaser in mind and therefore went to Schettler's farm to obtain a listing agreement. Simpson suggested that the price be set at $500,000 based upon what he called a "top dollar" figure of $2,000 per tillable acre for approximately 240–250 acres. The farm also included 20–30 acres of woodland, a house and several out buildings which were not given an independent value for purposes of Simpson's calculation. Schettler signed the listing agreement and Simpson thereafter attempted to sell the property primarily through telephone calls, letters and other contacts with potential buyers. He also showed the farm to the agent of the client he had in mind when he approached Schettler, but no offer was made.

Approximately two months after listing the farm with Simpson, Schettler called Charles Heritage ("Heritage"), another real estate broker, and asked him to sell the farm for her. Heritage spent several hours with Schettler at her house and specifically asked her whether she had previously listed her property. She reportedly said that she had not and signed the second listing agreement at an offering price of

**2.** As will be explained hereafter, Schettler signed two listing agreements—one called for a 7% commission and the other a 10% commission. The contract Schettler signed was based on a 10% commission but the commission was reduced by $7,500 to adjust for Schettler's obligation to pay McAllister's settlement costs.

$532,000. Heritage, like Simpson, attempted to generate interest in the property by contacting neighbors and running ads in the paper. Heritage also called McAllister about the farm since McAllister had told Heritage years earlier that he was interested in that type of property. McAllister immediately went to see the farm with Heritage. Schettler showed the two men part of the house and then, according to McAllister, left the house asking Heritage to close up when he and McAllister were through. That was the only time McAllister met with Schettler. At that meeting she apparently understood that McAllister was a prospective buyer and gave no evidence of any confusion or reluctance about the possibility that she would be selling the farm.

Following his inspection of the property, McAllister asked Heritage to draw up a contract to present to Schettler. That contract, dated October 10, 1983, contained all the same terms as the second contract that was executed except that the broker's commission was $22,000 rather than $35,000.

Before Heritage was ready to submit the first contract to Schettler, he got a call from Simpson, who told him about the prior listing agreement. On November 17, 1983 Simpson provided Heritage a copy of that agreement. As a result, on December 2, 1983, a second, co-brokered contract was drawn up. Before the second contract was presented to Schettler, however, Hill learned of its existence, and attempted to intervene.

The evidence indicates that Hill wanted the farm. He did not have enough money to purchase it, but Schettler had shown him a recent will in which, according to Hill, she bequeathed him "almost everything." From this description it would appear that Hill was to inherit the farm. Hill also knew that Schettler had made a new will, but claims not to have known its provisions. In any event, Hill must have known that either the new will or the possible sale could jeopardize his position.

Hill therefore arranged for Schettler to see William H. Vaughn, Esquire ("Vaughn") on December 7, 1983. Vaughn had been the Hills' attorney, and Vaughn's secretary, Diane Hill, was then Hill's wife. One of the purposes of that visit was to have Schettler give Hill a durable power of attorney. Hill testified that he wanted the power of attorney in order to review the sales contract. The other purpose of the December 7th visit was to have Schettler make a new will. It appears that Hill would have gotten the farm under this proposed will.

After Vaughn discussed the new will with Schettler and spoke to James J. Lazzeri, Esquire, the attorney who had prepared several of Schettler's previous wills, Vaughn decided that it would be appropriate for Schettler to be examined by a physician in order to determine her mental capacity to execute a will. No documents were signed on December 7th, and on December 8, 1983, Schettler was examined by Dr. Robert Donlick, her family physician. After Dr. Donlick decided that Schettler was competent to make a will, she was driven back to Vaughn's office, but Schettler did not wish to pursue the matter further at that time, and was taken home.

On December 9, 1983, Simpson went to Schettler's home to have her sign the contract. Hill was either there already or stopped by. A confrontation between Hill and Simpson ensued. Hill asked to see a copy of the contract and Simpson refused. Hill then told Simpson to leave the property. Hill immediately took Schettler to Vaughn's office. To his surprise, Hill found Simpson at the office as well. Both Hill and Simpson waited in an outer office while Vaughn discussed the contract with Schettler. Before Vaughn went through the contract terms at any length, however, Schettler indicated to him that she was not interested in selling the farm. As a result, Vaughn did not highlight for Schettler those contract provisions that Lord now argues are unconscionable (e.g., the $75,000 second mortgage to be held by Schettler). Schettler did not sign the contract or the power of attorney, but the events of the past three days were apparently taking their toll and she left the office in tears.

At this point Hill dropped out of the picture; he left on a trucking job to Florida in mid-December, 1983. Simpson, however, continued to pursue the sale. He decided that Schettler should consider the contract in a "neutral" environment away from her own home (where they might again be interrupted by Hill). Accordingly, Simpson arranged to take Schettler to his mother-in-law's house in Smyrna, Delaware on December 14, 1983. He picked up Schettler and Diane Mannering, an aide who was caring for Schettler, and drove them to the home of Betty Boyer Shockley ("Shockley"), Simpson's mother-in-law. Simpson discussed the contract in the car with Schettler and then went through it in some detail at Shockley's house. Simpson also made a tape recording of a portion of the meeting at Shockley's house "for future references." The only portions of the short transcript bearing on Schettler's capacity read as follows:

Mr. Simpson: "Alright. Now, uh, Mrs. Schettler, do you understand what we have done today. We have sold your farm, uh, by the nature of the contract of sale that's reflective of everyone's signatures here today. Uh, you are in agreement to sell the farm as you have done so, uh, at this particular point in time. If you are in agreement, say, 'Yes I am'."

Mrs. Schettler: "Yes I am."

Mr. Simpson: "Okay. You understand the nature of what we have done today. If you do ..."

Mrs. Schettler: "Sold the farm."

Mr. Simpson: "We sold the farm. Yes maam."

Mrs. Schettler: "How much?"

Mr. Simpson: "Okay. Uh, the price on the farm after the 20 year note is paid to you will be a total of about $523,000.00 payable this way: $350,000.00 on or before January the 15th and a note that you will hold for $75,000.00 at 10% interest for 20 year period of time. Correct? Okay. If that's correct, just say correct."

Mrs. Schettler: "Correct."

One week later, counsel for defendants wrote to McAllister's attorney advising that Schettler had determined not to sell the farm and that an action would be filed to set aside the contract. On or about January 20, 1984, Lord filed a petition in this Court seeking to be appointed the guardian of the person and property of Schettler, and on April 6, 1984, William J. Walls, Jr., Esquire was appointed guardian of Schettler's property and Lord was appointed guardian of her person.[3] This action was instituted on September 20, 1984.

II.

The first issue is whether Schettler was competent to enter into the contract on December 14, 1983. Adults are presumed to have contractual capacity and the burden of proving otherwise rests with the party alleging incapacity. *Husband (P.J.O.) v. Wife (L.O.)*, Del.Supr., 418 A.2d 994 (1980). Lack of contractual capacity will be found if Schettler was "incapable of understanding the nature and effect of the transaction" or her mental faculties were so impaired as to render her "unable to properly, intelligently and fairly protect and preserve [her] property rights." *G.A.S. v. S.I.S.*, Del.Fam.Ct., 407 A.2d 253, 257 (1978). A gradual weakening of mental capacity, even when accompanying extreme old age and serious illness, will not alone disable someone from making a contract. *Sims v. Slovin*, Del.Ch., 207 A.2d 597, 602 (1965), *aff'd.*, Del.Supr., 213 A.2d 903 (1965). Reviewing the evidence against this standard, I find that Lord has not met her burden of establishing Schettler's mental incapacity at the time the contract was executed.

Lord relied upon the opinion of Dr. Cornelison and the observations of various lay witnesses in support of her claim of mental incapacity. Dr. Cornelison, a psychiatrist, examined Schettler in June, 1986 and concluded that she was suffering from senile dementia and was totally incompetent. In his report, Dr. Cornelison noted that Schettler could not recall what she had eaten at her last meal, nor could she re-

---

**3.** On July 11, 1985, Lord replaced Walls as guardian of Schettler's property.

member his first visit when he returned three weeks later. She did not know her age, where she was born, when her husband died or how long she had been a resident at the Kent Convalescent Center. Dr. Cornelison concluded that Schettler has suffered from gradual mental deterioration and that her condition will continue to worsen. Based upon Schettler's spontaneous comment about her desire not to sell the farm, Dr. Cornelison concluded that this has been a long-term wish of Schettler's and, "[i]f she were persuaded to sign documents in the past allowing her land to be sold, this probably was done at a time when she was incompetent to make such a decision." Report of Psychiatric Evaluation and Opinion re: Pearl Schettler, P5.

Several lay witnesses testified as to their observations of Schettler at various times during the fall of 1983. One realtor, for example, decided that Schettler was incompetent because she was unable to carry on lengthy conversations and was forgetful. Another observed that she did not seem to hear him or understand what he was talking about. In addition, as noted earlier, Schettler signed a second listing agreement for the farm, apparently having forgotten the first, which she signed two months earlier. Several witnesses also testified as to Schettler's lack of competence in February and April, 1984.

From this evidence, one could not help but conclude that Schettler was having difficulty with her memory and attention span for several months prior to December 14, 1983. While this evidence is indicative of incompetency, I find at least equally persuasive the evidence suggesting that Schettler was competent on the date the contract was executed. Dr. Donelick, a general practitioner who has known Schettler for about ten years and has seen her occasionally as a patient, examined Schettler on December 8, 1983 for the specific purpose of determining whether she was competent to execute a document.

He examined Schettler for 15–30 minutes, asking questions about her medical history and present circumstances. Specifically, Dr. Donelick asked where Schettler lived and for how many years and whether she had had medical problems with hearing, vision or stomach ailments. He noted that Schettler's responses seemed logical and that she did not delay in answering his questions and appeared well oriented.

Great weight cannot be given to Dr. Donelick's opinion. He himself acknowledged that a psychiatrist would be better able to determine competency and that he would defer to a specialist's contemporaneous conclusions. Dr. Donelick's examination was relatively brief, he did not question Schettler about the nature of the transactions under consideration and, although he felt that her answers were logical, he did not know whether they were factually accurate. Nonetheless, Dr. Donelick's opinion cannot be totally disregarded. A substantial part of his practice includes the treatment of geriatric patients and his examination was performed a few days before the contract was signed.

■ In addition, from Simpson's tape recording, it appears that Schettler understood what she was doing when she signed the contract. Finally, since she resisted signing the power of attorney and this contract several days earlier, it is reasonable to conclude that Schettler would have had the strength to refuse to sign the contract on December 14, 1983, if, at that time, she did not wish to sell the farm. The fact that Schettler was ambivalent about the sale does not suggest any mental infirmity. It appears that she had a tendency to change her mind about significant matters since she executed no fewer than seven different wills during the two and a half years prior to October, 1983. In sum, although the question is not free from doubt, I find that Lord has not met her burden of proof on the issue of Schettler's alleged incompetency.

### III.

■ The fact that the contract may not be avoided on the ground of incompetency, however, does not mean that specific performance should be awarded. Plaintiff is seeking an equitable remedy and the Court, in its discretion, may decline to award spe-

cific performance where "independent equitable considerations ... directly affect the remedial right of the complaining party." *Lee Builders v. Wells*, Del.Ch., 95 A.2d 692, 693 (1953), *rev'd. on other grounds, Wells v. Lee Builders*, Del.Supr., 99 A.2d 620 (1953). Factors such as weakened mental condition in one party, undue influence and unfairness in the contract terms, although not of a sufficient degree to avoid the contract, may justify leaving the plaintiff to a damage remedy. In other words, though the weakening of the mental condition may not rise to the level of incompetency, the efforts to exercise undue influence may not have been successful and the contract may not, by itself, be so unfair as to shock the conscience, the combination of each incomplete factor will justify denial of specific performance. *Schiff v. Breitenbach*, Ill.Supr., 14 Ill.2d 611, 153 N.E.2d 549, 551–552 (1958); 11 Williston, Contracts §§ 1427–1428 (W. Jaeger 3d ed. 1968). Lord argues that all of these factors are present in this case.

■ The evidence establishes that Schettler's mental faculties were failing and that Hill was attempting to take over her financial affairs and obtain the farm by bequest.[4] In the face of these pressures, there is no evidence that anyone, be it a lawyer or a disinterested friend or business acquaintance, ever pointed out to Schettler the significance of the various contract terms. Two realtors were ostensibly her agents, yet there is no evidence that either of them suggested that she attempt to negotiate more favorable contract terms. Indeed, if the substance of Simpson's response to Schettler's question about how much she was getting from the sale of the farm is fairly stated in the transcript introduced into evidence, she may well have been misled.

At the time she signed the contract, Schettler was told that the price on the farm totaled approximately $523,000. Simpson did explain that $350,000 would be paid at closing and that a $75,000 note would be paid over 20 years at 10% interest. However, a more complete and more accurate response to Schettler's question would have resulted in a "total" of approximately $453,000, not $523,000. The contract required Schettler to pay $35,000 in real estate commissions, $7,500 of McAllister's settlement costs, $4,250 in transfer taxes and $24,000 in lease payments. If the $75,000 note were included in this calculation at face value, Schettler would have found that her net proceeds would be approximately $353,000 or approximately 32% less than the "total" given by Simpson.

An analysis of the contract itself, independent of the manner in which it was explained to Schettler, leads to the conclusion that it was a hard bargain at the time it was made. While the evidence suggests that the $425,000 purchase price was within the range of fairness, none of the realtors opined that $401,000 would be a fair price. The $24,000 difference comes from the lease clause in the contract. As noted at the outset, the contract provides that the property is to be free and clear of all leases or present lessee is to rent the 240 tillable acres for $100 per acre. There was testimony about the fact that neither McAllister nor the realtors were able to obtain copies of the existing leases prior to the execution of the contract. Thus, they assumed (or, more accurately, hoped) that any existing leases were terminable at will. In that event, the lease clause would present no financial burden to Schettler. However, the fact is that Schettler had a two-year written lease at a rent of $50 per acre. As a result, the parties are in agreement that Schettler would be obligated under the contract to pay a total of $24,000 to McAllister under the lease clause.

---

4. Legally cognizable undue influence consists of four elements: (1) a person who is subject to undue influence; (2) an opportunity to exert undue influence; (3) a disposition to exert such influence; and (4) a result indicating the presence of undue influence. *Robert O. v. Ecmel A.*, Del.Supr., 460 A.2d 1321, 1323 (1983). Thus, although Hill was undoubtedly trying to influence Schettler's behavior, since he failed completely to achieve his desired result, his actions do not constitute undue influence. They do, however, contribute to the totality of circumstances making specific performance inappropriate.

Another aspect of the contract that bears comment is the second mortgage Schettler was obliged to take back from McAllister. There is nothing inherently unfair about an elderly person taking a second mortgage. Here, for example, there is no evidence that Schettler needs the additional cash to maintain herself comfortably and, if she passes away before the mortgage is paid, the remaining balance will be an asset of her estate. A second mortgage may in some cases be necessary in order to sell one's property at a favorable price. However, Schettler hardly obtained a favorable price and, as a result of the second mortgage, 100% of the purchase price is being financed. Thus, Schettler faces a risk that her security interest in the farm will not fully compensate her in the event of a foreclosure.

■ It is questionable whether any one of these circumstances, standing alone, would be sufficient to deny specific performance. Viewed collectively, however, I find that equitable relief is inappropriate. Schettler was unsophisticated in business matters, in need of round-the-clock nursing assistance and somewhat mentally impaired. She was being pressured to turn over her affairs to Hill at the same time that she was presented with the contract. Schettler was taken to a stranger's home to sign the contract and, apparently, was never given a full explanation of her contractual obligations or the financing arrangements. The purchase price, after computing in the $24,000 lease payment, is approximately 25% below the higher of her two asking prices and includes the risk of carrying a second mortgage where there is no cushion of equity. Under this unusual combination of facts, I conclude that specific performance should not be granted.

I request that Lord's counsel prepare a form of order in accordance with this opinion, on notice.