COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
MASTER IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: October 31, 2022
Date Submitted: July 23, 2022

Beth B. Miller, Esquire
Nathan D. Barillo, Esquire
Nathaniel J. Klepser, Esquire
Fox Rothschild, LLP
919 N. Market Street, Suite 300
Wilmington, DE 19801

Michael J. Fahey, *pro se*
P.O. Box 562
435 Main Street
Clayton, DE 19938

Re: *In the Matter of the Estate of John Joseph Fahey,*
ROW Folio No. 177536 LW

Dear Counsel and Mr. Fahey:

The dispute before me concerns the inventory of an estate. A beneficiary challenges whether the inventory includes all the decedent's personal property, specifically contesting the designation of certain bank accounts as jointly owned assets and the failure to list various household goods. On the former, the beneficiary questions the decedent's capacity to change his beneficiary designations and add co-owners to his accounts in his final years. On the latter, the beneficiary argues that the executor failed to list the household goods and instead acted surreptitiously to dispose of that property, without proper notice or documentation and against the dictates of the decedent's will.

After a full trial on the merits, I find the decedent did not lack capacity, nor was he unduly influenced, when changing his bank account designations. But I find the executor failed to prepare a proper inventory of the decedent's estate, particularly regarding the household goods. The executor should, therefore, be required to prepare a new inventory listing all household goods, their fair value, and how each was disposed. This new inventory will then be subject to beneficiary challenges as further explained herein. This is my final report.

## I.      BACKGROUND[1]

This action stems from the estate of John J. Fahey (the "Decedent"). The Decedent was survived by his son Mark Fahey (the "Respondent") and predeceased by his other son, Michael J. Fahey, Sr., who passed on November 2, 2019.[2] Michael J. Fahey, Sr. had three children, the Decedent's grandchildren: Michael J. Fahey, Jr. (the "Exceptant"), Stacie N. Fahey, and Paul Fahey.[3] The Decedent was described

---

[1] The facts in this report reflect my findings based on the record developed at trial on June 29, 2022. *See* Docket Item ("D.I.") 80. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript, D.I. 80, are in the form "Tr. #." The joint exhibits are cited as "JX __."

[2] D.I. 77, p. 2.

[3] *Id.*

by his family and friends as a "social animal[,]"[4] a "very funny man[,]" and "fun person."[5]  He was "[q]uick-witted" and "[a]lways had a pun or a jab[.]"[6]  But his humor could not protect him from the worsening neuropathy he suffered in his eighties.

On January 30, 2019, at 80 years old, the Decedent suffered a fall and on February 2, 2019, was admitted to Encompass Health Rehabilitation Hospital in Middletown, Delaware ("Encompass").[7]  In the pre-admission information, Encompass notes that the Decedent was alerted and oriented to person, place, and time, could follow complex commands, his verbal communication was intact, and he did not have dementia.[8]  Upon his admission, the Decedent was described as needing minimal assistance with his basic activities of daily living, ambulation, and

---

[4] Tr. 195:11-12.

[5] Tr. 177:15-19. *See also* Tr. 137:18-20.

[6] Tr. 180:7-11.

[7] Tr. 12:8-9, 17:1-4; JX 35.  The Exceptant admitted that the Decedent was not in Encompass "for mental stuff; he was there because of a fall[.]" Tr. 91:22-23.

[8] JX 35, p.6 of 899.

dressing.[9]  Shortly after his admission, on February 4, 2019, the Decedent was noted as having "some cognitive issues[.]"[10]

On February 5, 2019, Encompass staff tested the Decedent's cognitive functions twice, once at 8:00 a.m. and again at 12:09 p.m.  The first test went well—the Decedent understood basic daily needs more than 90% of the time, interacted appropriately without supervision (although required "more than reasonable time to make decisions"), and solved "routine problems 75% to 90% of the time".[11]  At noon, his scores slipped—by then, the Decedent understood "directions and conversations about basic daily needs 50% to 74% of the time", "interact[ed] appropriately 25% to 49% of the time, but may need restraint due to socially inappropriate behaviors", "solve[d] routine problems 50% to 74% of the time", and "recognize[d] and remember[ed] 50% to 74% of the time".[12]  On February 5, 2019, another medical professional noted that the Decedent showed signs indicative of mild dementia.[13]

---

[9] JX 35, p.7 of 899.

[10] JX 35, p.342 of 899.

[11] JX 35, p.367 of 899.

[12] JX 35, p.365-66 of 899. To appears the Decedent was tested a third time on February 5, 2019, but the records are incomplete. *See id.* p.369 of 899.

[13] JX 35, p.798 of 899.

On February 7, 2019, the Decedent was described as "confused at times" and requiring "constant cues to complete activities throughout [his physical therapy] session."[14] Similarly, on February 10, 2019, Encompass noted the Decedent had "sundowning".[15] On February 12, 2019 at 9:00 a.m., additional tests were performed and the Decedent scored as follows: 90% comprehension, 75-90% appropriate interactions, 50-75% solve rate for routine problems, and 50-74% recognition and memory.[16] And, by February 14, 2019 and after approximately two weeks of rehab, Encompass determined the Decedent was "back at his baseline" and the Decedent was discharged from Encompass and transferred to Somerford House.[17] On Encompass' discharge summary the Decedent is described as having a history of "progressive decline in cognitive function".[18] The discharge summary further notes

---

[14] JX 35, p.636 of 899. *See also* JX 35, p.641 of 899.

[15] JX 35, p.173 of 899.

[16] JX 35, p.361 of 899.

[17] JX 35, p.50 of 899; Tr. 18:20-21. The Respondent testified that Somerford House is "an assisted care facility. So you have to be able to take care of yourself. . . . It's not a nursing home." Tr. 196:22-197:2.

[18] JX 35, p.48 of 899.

"significant cognitive dense dysfunction" and the need to "[c]ontinue redirecting the patient at this time."[19]

One day later, on February 15, 2019, the Decedent and his two sons went together to a Wells Fargo branch located in Middletown, Delaware to move the Decedent's Morgan Stanley accounts, including an IRA and various personal bank accounts, to Wells Fargo.[20]  As it existed at Morgan Stanley, the IRA would pass to the Decedent's sons per stirpes;[21] with the switch to Wells Fargo, the per stirpes designation was removed.[22]

The Decedent remained at Somerford House until December 2020, when he fell ill with COVID-19 and was transferred to Christiana Hospital.[23]  But before this hospitalization, the Decedent made another change to his finances.  On January 23, 2020, the Decedent and the Respondent went in person to a Wells Fargo office and executed a relationship change application, making the Respondent a joint owner of

---

[19] JX 35, p.50 of 899.

[20] Tr. 246:22-250:1; JX 1.  The Decedent also had an annuity with Pacific Life that listed his sons as beneficiaries. JX 5.  The account information does not include whether the beneficiaries' shares were per stirpes, but Pacific Life made a full payout to the Respondent. Tr. 244:14-245:9.

[21] JX 6.

[22] JX 3.

[23] Tr. 196:8-17.

the Decedent's personal bank accounts; this was a change from the original designation that the accounts would transfer on death to both sons.[24]

While in Somerford House, the Decedent was very active in the community.[25] He also received frequent visits from the Respondent, as well as other family and friends. Paula E. Fahey, the widow of the Exceptant's father Michael J. Fahey, Sr., who visited the Decedent nearly daily in Somerford House, testified that the Decedent always knew and called her by name and had rational conversations with her.[26] Adam Grygo and Ellen Grygo, the Decedent's brother-in-law and his wife, also testified that they had frequent visits and phone conversations with the Decedent throughout his time at Somerford House and never had any concerns about the Decedent's mental capacity.[27] Paula Ann Fahey, the Respondent's wife, testified that she would have conversations with the Decedent once or twice a week while he

---

[24] Tr. 232:14-233:12; JX 9; JX 7.

[25] Tr. 197:16-17.

[26] Tr. 143:7-24. Mrs. Fahey testified that she is an advocate for the Alzheimer's Association, is aware of the "signs" of Alzheimer's, and "in no way was [the Decedent] ever off his rocker, never. He knew what he was saying all the time or who [she] was or who anybody was. He always knew who [they] were." Tr. 145:11-16.

[27] Tr. 149:20-151:11; 178:9-179:12. Mr. Grygo explained that he knew the Decedent most of his life—having met him when Mr. Grygo was a child. Tr. 149:6-9. They were very close, like brothers, until the Decedent's death. Tr. 149:4-19.

was in Somerford House and that he would recognize her voice in the background when he was talking with the Respondent.[28]

The Respondent likewise testified that he spoke with the Decedent nightly between 7:00 p.m. and 8:00 p.m., and the Decedent would remember to call at this time while in Somerford House.[29] This practice continued through the Decedent's time at Somerford House.[30]

The Respondent also played three voicemails that the Decedent left for him while at Somerford House.[31] In the first voicemail, left in September 2019, the Decedent asked the Respondent for information about directions and requested that the Respondent return his call.[32] In the second voicemail, left in October 2019, the Decedent informed the Respondent that he would be home that weekend and that he was having trouble contacting his other son.[33] In the third voicemail, left on

---

[28] Tr. 184:2-185:4.

[29] Tr. 195:1-7. The Respondent testified that for the past 20 years, he and the Decedent would talk on the phone for 30-50 minutes each night. Tr. 190:21-22.

[30] Tr. 191:4-6.

[31] JX 16-18.

[32] Tr. 191:17-23.

[33] Tr. 192:24-193:6.

February 28, 2020, the Decedent sounded coherent and aware of what he was calling about, and when he wanted the Respondent to return his call.[34]

Paul Fahey, the Decedent's grandson, also testified that he had many rational conversations with the Decedent at Somerford House and no concerns about his mental capacity.[35] Conversely, the Exceptant and his sister had no personal knowledge of the Decedent's capacity during the relevant period. The Exceptant did not visit the Decedent while he was at Encompass and only visited the Decedent once at Somerford House.[36] Likewise, the Exceptant's sister, Stacie Fahey, did not visit the Decedent while he was at Encompass, or during the Decedent's time at Somerford House.[37]

---

[34] Tr. 193:24-194:3; Tr. 203:1-9.

[35] Tr. 261:2-18.

[36] Tr. 104:23-105:3; 97:16-20. The Exceptant explained that when he visited the Decedent in Somerford House in October of 2019, the Decedent did not recognize him. *See, e.g.,* Tr. 99:23-24. But the Exceptant also admitted he had not seen the Decedent for around two years before that visit. Tr. 100:11-101:3.

[37] Tr. 164:14-165:8. Stacie Fahey testified that, before the Decedent's admission to Encompass, she visited the Decedent and the Decedent seemed confused and did not remember her daughter. Tr. 161:13-163:14.

After his hospitalization, the Decedent moved to Southport, North Carolina, where he spent his final weeks living in the Respondent's Florida Room, being treated by hospice nurses and spending time with his family.[38]

The Decedent passed on March 24, 2021, leaving behind a last will and testament executed on January 10, 2001 (the "Will").[39]  The Decedent executed the Will before his wife passed and devised, should she predecease him, his sons should serve as co-executors and inherit equal shares of his estate.[40]  If either son predeceased him, as Michael J. Fahey, Sr. did, any surviving issue of such son would inherit their equal portion of that son's share in trust until the issue attained the age of 25.[41]

The Will was admitted to probate and the Respondent was granted letters testamentary on April 30, 2021.[42]  The Respondent worked to marshal the estate's assets which included real property located in the Decedent's home at 407 Sundial Lane, in Middletown (the "Property").  The Respondent traveled from North

---

[38] Tr. 203:15-206:2.

[39] D.I. 1; JX 27.

[40] JX 27, Item V, VII (mistakenly designated as a second Item VI).

[41] JX 27, Item VI.

[42] D.I. 1-3.

Carolina to Delaware to clear out the Property around April 5, 2021 and prepare it for sale.[43]

The Respondent testified that the Property had been vacant for some time, but he kept it "like a museum[.]"[44] Within that museum was worn furniture including the Decedent's bedroom furniture, "two Ozzie and Harriet beds" in the second bedroom, recliners, "an old sofa", a dining room table, a card table, and tools, wood scraps, broken furniture, and art supplies in the garage.[45] Per the Respondent, "[t]he most valuable thing in that house was [the Decedent's] oil work, his oil painting work."[46] The Respondent did not, however, create an itemized list of this property before he went about disposing of it.

The Respondent called the Decedent's three grandchildren on April 9, 2021, inviting them to select items of personal property.[47] The Respondent was adamant at trial that he gave the Exceptant and his siblings the first opportunities to take personal property from the Property, and that his own children did not receive such

---

[43] Tr. 212:6-8. The Exceptant confirmed that he knew about and agreed to sell the Property. Tr. 34:6-10.

[44] Tr. 212:17-22.

[45] *See* Tr. 212:22-213:20.

[46] Tr. 216:9-10.

[47] Tr. 212:8-9.

an opportunity.[48]  The Respondent also testified that he did not object to any requests by the Exceptant or his siblings to take items from the Property.[49]

The Exceptant and his sister tell a different story.  The Exceptant testified that virtually everything was gone by the time he arrived at the Property on April 13, 2021.[50]  The Exceptant was only able to take "a couple paintings, a wooden stool, and a shovel" from the Property.[51]  The Exceptant had been hoping to retrieve a specific painting of him and his siblings, but the painting was not at the Property when he arrived.[52]

Stacie Fahey, the Exceptant's sister, also testified that by the time she was able to get to the Property there was virtually nothing left, although there was still furniture and some paintings.[53]  She believed other family members came and took

---

[48] Tr. 216:23-11.

[49] Tr. 216:12-19.

[50] Tr. 42:17-43:8. For the Exceptant's visit, the Exceptant picked the Respondent up from Encompass, where the Respondent was visiting another relative, and together they drove to the Property to look at the remaining personal property. Tr. 42:11-18.

[51] Tr. 111:20-24.

[52] Tr. 112:12-16.  The Exceptant believes the Respondent ended up with the painting.  Tr. 112:14-22.  The Exceptant was not shy about his distrust of the Respondent, which led him to secretly record their conversations about the Decedent's estate. *See* Tr. 116:2-117:5.

[53] Tr. 169:4-15.

property first.[54]  When she left the Property, she took some items that she could carry in her hand.[55]  The Respondent denied that other family members had the chance to take property first and maintained that he allowed the Exceptant and his siblings to take whatever they wanted.[56]

The Respondent admitted that he took certain items including "an oak chest refrigerator", "[a] couple end tables with a lamp", and "an old Craftsman toolbox[.]"[57]  The Respondent rented a seven-foot-by-seven-foot pod to transport that personal property back to North Carolina with him.[58]  Before he left, the Respondent sold most of the Decedent's remaining furniture for $300 to an estate company and threw the pieces the company did not want into a dumpster.[59]  In the

---

[54] Tr. 169:1-4.

[55] Tr. 169:16-21.

[56] Tr. 217:6-24.

[57] Tr. 215:17-24.

[58] Tr. 215:24-216:3.

[59] Tr. 216:13-22.

Respondent's view, this was a necessary step to prepare the Property for sale.[60] The

Respondent left Delaware and returned to North Carolina on April 22, 2021.[61]

## II.    Procedural Posture

The Respondent filed an inventory of the Estate on June 17, 2021 (the

"Inventory").[62] The Exceptant filed exceptions to the Inventory on August 10, 2021,

specifically contesting the assets listed in Schedule D of the Inventory, "jointly-held

property", and Schedule E, "miscellaneous property".[63] The Respondent filed a

response to the exceptions on September 9, 2021.[64]

---

[60] Tr. 216:2-3. In his closing statement, the Exceptant asks for his portion of the proceeds from the sale of the Property. D.I. 82, p.9. But the Property passed outside the estate by operation of Delaware law and the disposition of the sale proceeds is outside the scope of the exceptions. *See In re Harris' Est.,* 44 A.2d 18, 19 (Del. Orphan's Ct. 1945) ("[T]itle to real estate descends to the heir or vests in the devisees immediately upon the death of the testator[.]").

[61] Tr. 212:12-13.

[62] D.I. 5.

[63] D.I. 7. Although this appears to be the first time this family has litigated an estate dispute, this is not the first estate to contribute to familial tensions. The Exceptant explained that when his father passed, he and his sister were largely excluded from the estate, which went to their brother Paul, causing a rift still evident during trial. *See, e.g.*, Tr. 57:10-22.

[64] D.I. 10.

Trial was originally scheduled for January 6, 2022.[65] But it was continued multiple times; ultimately, the exceptions were tired June 29, 2022.[66] I invited post-trial closings, which were filed by July 14, 2022, at which time the matter was submitted for my consideration.[67]

## III.   ANALYSIS

Under 12 *Del. C.* § 1905, the Respondent, as executor, was required to file an inventory within three (3) months of the grant of letters testamentary—by July 30, 2021.[68] The inventory needed to "contain an inventory of all goods and chattels of the decedent, a list of all debts and credits due or belonging to the decedent or to the decedent's estate, and a statement setting forth a general description of every parcel of real estate in this State of which the decedent died seized[.]"[69]  "Each item of property included in such inventory, list and statement, [needed to] be separately valued at its fair market value as of the date of death of the decedent".[70] The executor

---

[65] D.I. 14.

[66] D.I. 63.

[67] D.I. 81, 82.

[68] 12 *Del. C.* § 1905(a).  *See* D.I. 3.

[69] 12 *Del. C.* § 1905(a).

[70] *Id.*

further needed to attach an affidavit affirming that the Inventory "contains all the goods, chattels and money of, and debts or credits due or belonging to [the decedent] . . . which have come to the knowledge of the [executor] . . . ."[71]

The inventory requirement "is clearly designed to protect individuals with an interest in the estate[,]" like the Exceptant, who "possess[ ] a legal right to a complete inventory and appraisal of all the property[ ] . . . owned by the decedent at the time of [his] death."[72] Thus, executors "must make reasonable efforts to determine, in an objective fashion, what must be stated on an inventory and what must not."[73] The only items statutorily excluded from an inventory are "[t]he family Bible; clothes of the decedent; and the family stores laid in before the death of the decedent."[74] Thus, as this Court has recognized an inventory must include "furniture, appliances, tools and other personalty which were owned by the decedent at the time of her death. This includes property which currently remains in the executrix's possession,

---

[71] 12 *Del. C.* § 1905(b)-(c).

[72] *In re Est. of McDowell*, 1983 WL 103268, at \*2-\*3 (Del. Ch. Aug. 5, 1983).

[73] *In re Cattlett*, 2021 WL 4060387, at \*3 (Del. Ch. Feb. 12, 2021).

[74] 12 *Del. C.* § 1901(b).

property she has disposed of as worthless, property she has kept for personal use, property she has given away and property she has sold."[75]

Under Court of Chancery Rule 197, "[e]xceptions to an inventory may be filed with the Register of Wills at any time after the filing of the inventory but not later than 3 months after the mailing of the notice of the filing of the final accounting."[76] "Once exceptions are filed . . . the burden of proof falls on the personal representative to demonstrate that the inventory or accounting was properly prepared."[77] That burden, however, shifts if the exceptant seeks a surcharge.[78]

Here, the Exceptant seeks a surcharge and raises challenges to parts of the inventory: Schedule D, "jointly-held property" and Schedule E, "miscellaneous property". On the former, the Exceptant argues the Decedent did not have the capacity to change his beneficiary designations or add co-owners or was otherwise subject to undue influence in doing so. On the latter, the Exceptant contends that

---

[75] *In re McDowell*, 1983 WL 103268, at *2–3.

[76] Ct. Ch. R. 197(a).

[77] *In re Childres*, 2021 WL 3283028, at *3 (Del. Ch. Aug. 2, 2021).

[78] *See* Ct. Ch. R. 198. "A surcharge is, essentially, a sanction against a personal representative requiring the personal representative to fund (or refund) the estate because the personal representative improperly or poorly handled the estate, engaged in self-dealing, or improperly depleted estate assets." *In re Clark*, 2019 WL 3022904, at *7 (Del. Ch. July 9, 2019).

the inventory fails to disclose and value the Decedent's personal property. I address these challenges in turn, holding the Exceptant to his burden of proving entitlement to a surcharge by a preponderance of the evidence.[79]

### A.  Exceptions to Schedule D should be overruled and dismissed.

Initially, I find the Exceptant's attempt to challenge capacity through exceptions to the inventory is procedurally improper. Under Court of Chancery Rule 207, "petitions for a rule to show cause to compel return of assets to an estate, . . . and other similar petitions concerning the estates of decedents that require judicial action by the Court of Chancery shall be filed as civil actions with the Register in Chancery." The Exceptant's capacity challenge falls squarely within this rule—it seeks a declaration that allegedly jointly owned property was solely owned by the Decedent and should be returned to the estate. Thus, the Exceptant should have filed a civil action with the Register in Chancery; having failed to do so, his request for relief could be denied on procedural grounds.

Nevertheless, these claims have been fully tried and I find it appropriate to address their merits. An individual has a presumption of capacity and "the party

---

[79] "[T]he exceptant 'must demonstrate affirmatively that a surcharge is warranted.'" *In re Marvel*, 2018 WL 4762379, at *2 (Del. Ch. Oct. 1, 2018) (quoting *In re Stepnowski*, 2000 WL 713769, at *1 n.1 (Del. Ch. May 2, 2000)).

who challenges . . . capacity has the burden of overturning that presumption by a preponderance of the evidence."[80]  Here, the question is whether the Decedent had the capacity to remove the per stirpes designation on the IRA and add the Respondent as a joint owner to his personal bank accounts.

These questions implicate the capacity to contract, which is a low bar.  "Lack of contractual capacity will be found if [the Decedent] was 'incapable of understanding the nature and effect of the transaction' or [his] mental faculties were so impaired as to render [him] 'unable to properly, intelligently and fairly protect and preserve [his] property rights.'"[81]

Alternatively, the Exceptant argues the Decedent was unduly influenced to effectuate the challenge transactions.  The essential elements of undue influence are: "(1) a susceptible [testator]; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect."[82]  The following principles apply:

> (1) the party claiming undue influence has the burden of proving it by a preponderance of evidence; (2) the existence of opportunity

---

[80] *In re Boyd*, 2003 WL 21003272, at \*4 (Del. Ch. Apr. 24, 2003).

[81] *McAllister v. Schettler*, 521 A.2d 617, 621 (Del. Ch. 1986) (quoting *G.A.S. v. S.I.S.,* 407 A.2d 253, 257 (Del. Fam. 1978)).

[82] *In re Est. of Cole*, 2010 WL 716151, at \*5 (Del. Ch. Jan. 20, 2010).

and motive, while relevant to the inquiry, do not, of themselves, establish undue influence; and (3) the burden of proof is not met if the evidence supports two equally plausible explanations for a late change of beneficiary, one of which involves undue influence.[83]

When addressing capacity or weakened intellect, timing is key. Here, the challenged transactions occurred on February 15, 2019 and January 23, 2020. Thus, I focus on the evidence of capacity around those times. At best, the evidence of the Decedent's capacity is in equipoise. During the Decedent's stay at Encompass, his mental status varied from fully independent to needing redirection and assistance to engage appropriately in social interactions and problem solving. His capacity, it appears, changed not only day by day but throughout the day, as reflected by the disparate cognitive tests conducted on February 5, 2019. But these records do not support a finding that the Decedent, more than likely, did not appreciate the nature and effect of the removal of the per stirpes designation on February 15, 2019, or that he was unable at that time to engage in the transaction properly, intelligently, and

---

[83] *In re Est. of Justison*, 2005 WL 217035, at *9 (Del. Ch. Jan. 24, 2005).

fairly.[84] Thus, the capacity challenge to the February 15, 2019 change should be denied.[85]

Viewed under an undue influence lens, the medical records do support a finding that the Decedent was susceptible to undue influence based on his weakened mental capacity. But the Exceptant has failed to prove actual assertion of undue influence by the Respondent; without such the Exceptant's claim must fail.

Turning to the second transaction—the addition of the Respondent as a co-owner on the personal bank accounts—I find the Exceptant again failed to meet his burden of proof. The Exceptant failed to adduce any evidence that the Decedent suffered from mental deficiencies while staying at the Somerford House in and around the time of this January 23, 2020 transaction.[86] Conversely, the Decedent's

---

[84] The Exceptant argues that the Encompass admission paperwork supports a finding of incapacity because the Exceptant's father signed the paperwork on the Decedent's behalf. *See* Tr. 14:3-7. But the admission paperwork was also signed by the Decedent, JX 35, p.17 of 899, and the record does not support a finding that the Exceptant's father was acting under the springing power of attorney. JX 14. It is also likely that the Decedent's neuropathy interfered with his ability to sign on his own behalf. *See* JX 35, p.798 of 899.

[85] The Exceptant appears to argue that the Decedent's move to Somerford House, alone, supports a finding of lack of capacity. The theory seems to be that the Decedent was determined to be unable to return home and was placed, instead, at Somerford House. But I cannot find a lack of capacity from this placement, alone.

[86] The Exceptant called my attention to the Decedent's signatures in January 2020, arguing "you could tell even just from his signatures that he had a mental decline and he didn't even know what he was doing from his signature." Tr. 66:21-23 (citing JX 32). But I cannot

friends and loved ones testified credibly that the Decedent maintained not only his coherence and understanding, but his wit and humor throughout his time at the Somerford House.[87]  And although he may have been susceptible due to some level of mental decline, the Exceptant again failed to demonstrate actual assertion of undue influence regarding this transaction.

Because I find the Decedent had the capacity to make the challenged transfers and they were not the result of undue influence, the Exceptant's exceptions to Schedule D should be overruled and dismissed.

**B.      Schedule E of the Inventory is incomplete.**

As explained above, when a personal representative files an inventory, it must contain, among other things "an inventory of all goods and chattels of the decedent[.]"[88]  Yet, the only item of miscellaneous property included in Schedule E of the Inventory was the Decedent's car.  None of the Decedent's household goods,

---

make such a leap. *See, e.g., In re Melori*, 1987 WL 6442, at *7 (Del. Ch. Feb. 11, 1987) (discussing the different explanations for variance in a signature, including the health of the signer). It is also likely that the Decedent's neuropathy altered his signature.  *See* JX 35, p.798 of 899.

[87] The Exceptant contests this testimony, explaining that when he visited the Decedent at Somerford House, the Decedent did not remember him. *See, e.g.,* Tr. 99:23-24.  But I find I cannot attribute this lack of recognition solely to lack of capacity because the Decedent had not seen the Exceptant for around two years before that meeting. Tr. 100:24-101:3.

[88] 12 *Del. C.* § 2301(a).

including furniture, paintings, or other items remaining at the Property were included, listed, or appraised. Instead, the Respondent allowed himself and the Decedent's grandchildren to take what they wanted from the Property. The Respondent also sold some of the Decedent's furniture and disposed of other personal property in a dumpster. All without itemization of same on the Inventory.

The instant dilemma is similar to that in the *Estate of McDowell*. In *McDowell*, the executrix failed to itemize household goods on her inventory and instead used a flat estimate of $500, which did not itemize or account for property gifted, sold, or trashed.[89] A beneficiary filed exceptions based on undervaluation and the executrix argued "the items were not valuable enough to warrant appraisal. The cost of appraising such property would only deplete the estate."[90] But Vice Chancellor Longobardi was unconvinced. He found, instead, the executrix failed to meet her duty to provide a complete inventory.[91]

The executrix in *McDowell*, thus, was "ordered to conduct a new inventory of all items . . . in her possession[,]" and "directed to have the items she has stored

---

[89] *McDowell*, 1983 WL 103268, at *1.

[90] *Id.* at *1,

[91] *Id.* at *3.

appraised and sold and to apply the amount received to the other assets of the estate."[92]  As to the items already sold, the executrix was required "to list any and all proceeds received from the sale of those items as assets of the estate."[93]  And for those discarded, trashed, or gifted, those items were also required to be listed on the inventory with "a detailed description of each and . . . some reasonable value [assigned] to each."[94]  Beneficiaries could then challenge the valuations.

Like the executrix in *McDowell*, the Respondent should be required to file a new inventory listing all items of personal property.  Any items still in the Respondent's possession should be appraised, sold, and added to the estate account.  Items already sold should be listed with their sale price.  Items given or thrown away should be assigned a reasonable value and contain a notation regarding to whom they were bequeathed or when and where they were disposed of.  All interested parties can file exceptions to the new inventory and additional proceedings may be

---

[92] *Id.* at *3.

[93] *Id.*

[94] *Id.*

necessary to ensure the personal property transfers did not conflict with the Will's dispositive scheme.[95]

## C.    **Fees should not be shifted.**

The Respondent asks that his attorney's fees and costs be shifted to the Exceptant. "Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees[.]"[96] The Respondent has identified no special circumstance and I find that both parties should bear their own fees and costs.

## IV.    CONCLUSION

For the above reasons, I find that the exceptions to Schedule D should be overruled and dismissed, the exceptions to Schedule E should be sustained, the Respondent should be required to prepare a new inventory as specified herein, which may be subject to future challenges, and the parties should bear their owns costs and

---

[95] The Respondent testified that he took certain items that the Decedent wanted him to have. Tr. 215:17-216:3. But there is nothing in the record reflecting the Decedent's wishes for items of personal property, which is often disclosed on an attachment or schedule to a testator's will. Without such, the Respondent is bound to follow the dictates of the Will that the residue of the estate, which includes all personal property, be distributed to his sons in equal shares, per stirpes. To the extent the Respondent bequeathed himself more than his 50% share of personal property, a surcharge may be warranted.

[96] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

attorneys' fees.  The Respondent's new inventory should be filed within twenty (20) days of this becoming an order of the Court.  Any exceptions thereto would need to be filed under Court of Chancery Rule 197.

That said, I encourage the parties to explore a mutually agreeable resolution of their remaining disputes.  This matter seems well poised for mediation and I have seriously considered a referral to mediation under Court of Chancery Rule 174.  Although I decline to mandate mediation at this stage, I would be inclined to make a referral if the parties' disputes continue or escalate in the future.  In this family matter, the parties would be wise to reopen the lines of communication and find a way forward without additional costly and time-consuming litigation.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery